The plaintiff instituted an action against the defendants at Spring Term, 1874, of New Hanover Superior Court, in his complaint alleging:
He is the owner of a tract of land in said county, on which there are about one hundred acres of very fertile swamp land, most of which is cleared and well adapted to cultivation. Said swamp land was low, and in its natural state there was a good deal of water (768) thereupon, and the same was too wet to be used successfully for farming purposes. The plaintiff and those under whom he claims, by expending large sums of money in cutting various ditches thereupon, and by expending much time and labor in its improvement succeeded in draining said land, and the same is now, not only cleared, but in so high a state of cultivation as to yield twelve hundred bushels of corn, besides other products.
The defendant, Dawson T. Durham, is the owner of land adjoining the said land of the plaintiff, and the defendant Bryant Brown, and the defendant Council Brown as tenants in common, are also the *Page 573 
owners of land adjoining that of the plaintiff, and have owned the said land for several years.
There being some disagreement and ill feeling between the plaintiff and the defendant Durham, which has now existed for several years, the latter disregarding the rights of the plaintiff and intending to render his farm less valuable formed the deliberate purpose as the plaintiff believes, and threatened to drown out the plaintiff's farm by ditching certain ponds and low places, among which was a large basin containing from fifty to seventy-five acres, lying on the lands of said Durham near the plaintiff's farm, and turning the water therefrom upon the farm of the plaintiff. The natural way and course of draining the same is not by directing the waters therefrom, to and in the direction of the plaintiff's farm, and that the real purpose which said Durham had in view, was not to enhance the value of his land, but to impair and depreciate that of the plaintiff.
The defendant Durham in the prosecution of his unlawful purpose has actually ditched the low places, ponds and basin aforesaid, and has directed the waters thereon from their usual and natural course, so that it runs upon the said land of the plaintiff.
There are upon the lands of the defendants Brown two of several branches, and a third branch on the land of one Sparkman and the "Walker estate" which carry off from said land, large (769) quantities of water. Said branches do not flow in the direction of the plaintiff's farm. The natural, usual and cheapest course of drainage of the land aforesaid, is down the course of said branches, which hereinafter will be designated as branches No. 1, 2 and 3 respectively. No. 1 being nearest to the farm of the plaintiff; No. 3 farthest, and No. 2, intermediate between No. 1 and No. 3. (See plot post.)
The defendant, Durham, as the plaintiff believes, has confederated with the defendant, Bryant Brown, who is not well disposed toward the plaintiff, and is partial to Durham in the disagreement aforesaid, for the purpose of further impairing the value of the plaintiff's farm. Under some arrangement between them, the terms of which are to the plaintiff unknown, the defendant, Durham, is now actively engaged with hands in cutting a ditch about three feet wide and varying from four to six feet in depth, beginning at a point near the plaintiff's farm, and running in a direction to enter and cross said branches, for the purpose of directing the waters thereof from their natural course and throwing them upon the plaintiff's farm. This ditch has already been cut to and across branch No. 1, and to a point near branch No. 2, the whole distance finished being between six and seven hundred yards. After said ditch had been cut through a ridge near branch No. 1, the *Page 574 
defendants, Durham and Bryant Brown, seeing that it was not deep enough to turn the waters of said branch down the ditch in the direction of the plaintiff's farm, caused the said ditch to be cut deeper, and carried it up the course of said branch for a short distance, thence out on the other side, making such a dam on the lower side thereof as is sufficient under ordinary circumstances, to force the waters of branch No. 1 to follow the course of said ditch.
The ditch has been finished to within two hundred yards of branch No. 2, and the work is being prosecuted with vigor, and if the (770) same is not arrested, the waters of branch No. 2, which is the largest of said branches, will be thrown upon the plaintiff's farm. The plaintiff is informed, and believes, and therefore avers, that it is the purpose of the defendants to carry the said ditch to branch No. 2, and then up branch No. 2 to a ditch leading into branch No. 3, known as "Devil's Ditch," which is no great way off, digging it to such a depth as may be necessary to turn the waters of said branches down said ditch upon the plaintiff's farm, their object being to destroy the same.
That part of said ditch which has been finished is, and the whole thereof, when finished, will be, upon the lands of the defendant, Brown. It does not drain any land belonging to the defendant, Durham, and he owns no land in the direction in which it is being cut. The ditch will direct the waters in said branches from their natural and usual course, to the great injury of the plaintiff, and is not necessary and proper for the draining of the lands of the defendants, Brown, and that only a shallow surface ditch is required for that purpose. If carried through the said ditch, the waters of said branches will be diverted at least one thousand yards from their natural course.
The plaintiff is satisfied that the main purpose for which said ditch is being cut, is to destroy his farm.
That if the waters of branches Nos. 2 and 3, or either of them, should be directed into said ditch, they will flow down the same and upon the plaintiff's farm in such quantities that it will be irreparably injured, and he will not be able to raise thereupon more than one-third of the average yearly crop. In addition to this, a great part of the labor and money which he has already expended in draining and improving the same will be lost, and he will not, in the future, be able to cultivate or use it to any advantage.
He believes that the defendants, Durham and Bryant Brown, intend to complete the ditch for the purpose aforesaid without delay, (771) and if they are not restrained from so doing by an injunction, the work will be very soon completed, and the value of the plaintiff's farm will, in a great measure, be irreparably destroyed. *Page 575 
Damage has already been done to the farm of the plaintiff by turning thereupon the waters of branch No. 1.
The defendant, Council Brown, is an invalid, and generally confined to his room, and the plaintiff believes, and so avers, that he has had no part in cutting said ditch, and that the same is not being done by his direction, and that he has in no way been connected with the conspiracy and collusion above referred to.
The complaint demands judgment against the defendants, Dawson T. Durham and Bryant Brown, for — dollars damages, and for a perpetual injunction restraining them "from working on, cutting or digging the said ditch, and from doing any and every thing towards its completion."
Upon the foregoing complaint, the same being verified, his Honor, JudgeRussell, at Chambers, on April 17th, 1874, on motion, granted an order restraining the defendants from further working upon the ditch until further order of the court.
The defendants filed affidavits and the following answer, and thereupon moved the court to vacate the injunction:
The defendants admit that the plaintiff is the owner of the said tract of land, as alleged, and the defendants are the owners of lands adjoining the same. (See plot post.) All of these lands were at one time owned by Dr. J. F. McRee. More than twenty years ago, he conveyed to W. B. Meares all the land represented on the plot as the "Meares Tract," which includes the land now owned by the plaintiff, and marked on said plot as the Pigford tract, (200 acres,) as well as the lands belonging to the defendant, Durham, adjoining them, and also another tract of land owned by the plaintiff, lying west of the W. W. Railroad. In 1858, McRee sold and conveyed to the defendants, Bryant Brown and his brother Council Brown, as (772) tenants in common, the land represented on the plot as the "B. Brown land," and they have owned and occupied the same ever since. In 1858, Meares being then the owner of the said two adjoining tracts now owned by the plaintiff and the defendant Durham respectively, conveyed the lower tract described on the plot as the "Pigford tract," to B. W. Berry, as trustee for the wife of Samuel Berry, and in the deed of conveyance reserved to himself, his heirs and assigns the right and privilege of draining any of the said lands, through the tract thereby conveyed. About 1868, the heirs at law of Mrs. Berry conveyed the same to the plaintiff. On the 28th of January, 1860, W. B. Meares conveyed the upper tract to Hinton E. Carr, and conveyed therewith the right of drainage, through the said Berry land, now the property of the plaintiff. On the 10th of December, 1867, Carr sold the same, with all the rights and privileges, to the *Page 576 
defendant Durham. More than thirty years ago, Levin Lane, who was the owner of the land immediately south of the "W. B. Meares tract," for the purpose of draining his land, cut a large canal from the North East river, up near to the southern line of the plaintiff's land, then owned by McRee, being that portion of the canal represented on the plot by the letters A, B, C, D, E, which extends from A to C. About the same time, McRee cut a portion of said canal about five or six hundred yards from the letter D, about the center of the tract now owned by the plaintiff, in a southerly direction toward the southern line of said tract of the letter C. In 1858, Samuel Berry, then the owner of the said tract, cut that portion of the canal extending from the point to which McRee had cut, so as to connect at the letter C, with the canal opened by Lane, and which was done by his consent, and under an agreement with said Lane, as the defendants have been informed and believe.
In 1861, the said Berry cut that portion of the canal extending (773) from the letter D westwardly to the western line of said tract in the direction of "E." The balance of the canal from the said point in the western line of the Berry (now the plaintiff's) tract, passing through a portion of the defendant, Durham's, and through the defendant Brown's lands toward the centre thereof at P, was cut some years ago by the defendant Brown and Hinton, E. Carr being then the owner of this land, now owned by the defendant Durham, and which joins the Brown land on the south. This was done at the instance of Brown and his brother, Council, in order to drain their land, under a contract with Carr for that purpose, the Browns paying the entire cost of that portion of the canal on their land, and one-half of that portion running through Carr's land.
In 1853, W. B. Meares cut the canal represented on the plot as the Meares canal, extending from a point here in the canal, heretofore described, and near the western line of plaintiff's land, through the said tract in a northeasterly direction to Clayton's creek. One of these canals will average about eight feet wide and from four to six feet deep; the other about five feet in width and about three feet in depth, and are of sufficient capacity if kept open and cleaned of obstructions to carry off the water from the lands of the defendants and from the plaintiff's land, and thus furnish the means of effectually drawing the same in ordinary seasons; so that when the plaintiff became the purchaser of the land, which he complains is in danger of being injured by the opening of the ditch described in the complaint, the Browns had already acquired the right to drain their lands through the canal, hereinbefore described, and the defendant, Durham, had acquired the right to drain his lands through the lands of the plaintiff. *Page 577 
It is not true, as alleged, that the defendants are engaged in cutting a new ditch from a point near the plaintiffs' farm. It is true that the defendant, Bryant Brown and his brother, Council, have opened and cleared out a portion of an old ditch, which was (774) cut a great many years ago, represented on the plot by the letters, J. K. L., which, upon an average, is about two feet in width, and about three feet in depth.
The defendant Brown says that their purpose in opening said ditch was to improve their lands and the health of their residence and with no intention of in any way doing any injury to the plaintiff. The plaintiff's land has not and will not be injured by opening said ditch. The ditch which is altogether on the land of the defendant Brown, begins at a point indicated on the plot by the letter I, west of and near to the canal above described, which for convenience, may be called the main canal and runs west about two hundred and fifty yards to K, passing south of and about two hundred yards from the dwelling of the defendant Brown, thence nearly a north course on the east side and near to and along the Duplin road to branch No. 1, (which save in a wet season has little or no water in it,) thence up said branch and across Duplin road and across Duplin road, thence along said road on the west side thereof to L. The whole length of said ditch is about seven hundred and fifty yards to a ridge of considerable elevation, and about fifty or sixty yards wide, which separates the waters of branches Nos. 1 and 2. The effect of opening the ditch is merely to confine the water and carry it along the same to the main canal at letter O, instead of suffering it to flow over the land of the defendant Brown into the said canal, thereby injuring the land and seriously impairing the health of his place. The opening of this ditch does not throw into the canal or the lands of the plaintiff one drop of water more than would find its way there without it. From this ditch to the nearest point of the plaintiff's land, (the northwest corner,) is about three hundred yards, but to that portion of his lands which he complains is injured, is about a half a mile. It is true that the defendant Durham has superintended the employees of Brown engaged on the work; this he has done at the request of Bryant and Council Brown, one of whom is confined to his house by disease (775) and the other is so much disabled that he gets about his farm with great difficulty. The ditch is on the defendant Durham's way from his house to his plantation and he passes there nearly every day, so that with very little trouble he could give directions to the employees engaged in opening the ditch. What he has done was simply a neighborly act, prompted solely by a disposition to aid neighbors who were unable to direct the work themselves, on account of physical *Page 578 
inability, and without the remotest idea of doing any injury to the plaintiff.
The defendant Brown says that he had no idea of continuing the ditch through the ridge, or to branch No. 2, with a view of turning the water thereof in that direction, for as the plaintiff truly says, he would then be directing the water about one thousand yards from its natural course, and would also have turned the waters thereof on his own land.
There was no purpose entertained by either of the defendants of extending the ditch to branch No. 3, or of endeavoring to turn the waters of branch No. 2 along the ditch, in the ditch in the direction of the plaintiff's land. The defendant Brown did intend to open the ditch on the north side of this ridge beginning at the letter Q and extending to branch No. 2, R, so as to carry off the surface water into branch No. 2, about the letter R and clear out and open said branch below that point to where it empties into "red Hill canal," down this canal to Clayton creek, and thence into the river, thereby more effectually draining the lands of the defendant Brown, the effect of which would be to turn the waters away from the plaintiff's land more effectually.
The opening of said ditch from letter Q to R, so as to drain the water into branch No. 2, is necessary, to drain a considerable part of the land owned by himself and his brother, Council Brown, and render it fit for proper cultivation. The order restraining the defendants opening said ditch, does great injury to them and seriously (776) interferes with and hinders their farming operations during the crop year, and does them a great wrong and injury. That if the plaintiff could sustain any injury by the acts of the defendants, as he has complained, the defendants are amply able to answer in damages for such injury, and there is, therefore, no necessity for the interference of the court by its extraordinary writ of injunction, even upon the case as set forth in the plaintiff's complaint.
It is true that the defendant, Durham, has cut the ditch, F, G, H., but it is not true that it was done for any such motive as alleged. The ditch, from F to G, was cut in September, 1873, and from G to H, in January and February last, and for the purpose of draining some ponds in front of his residence and the residences of his tenants, thereby improving the health of both, as also to benefit an academy, which was near the ponds, and for the further purpose of draining his lands around the depot, on the east side of the railroad, so as to make the lots at the depot more valuable as building lots. The ditch empties into the swamp about seven hundred yards from Porter's line, designated in the plot as the "Pigford" place. this intervening land, which *Page 579 
is all swampy, is owned by the defendant, Durham, and the opening of this ditch does not cause any additional flow of water on Porter's land. The waters of the swamp are carried off by the main canal, and none of it goes upon Porter's land except through the canal, and at the point where the canal strikes Porter's land, he has thrown up dams on both sides of the canal, north and sought, the effect of which is, that when the canal overflows, the water is ponded back on the waters of the defendant, Durham, until it is absorbed by the earth or finds its way through the canal.
The defendants deny each and every allegation in said complaint contained, which is not herein specifically admitted.
The answer was verified, and defendants produced copies of the several writings mentioned therein, and also filed several affidavits, which are not necessary to be set out in order to understand the (777) case as decided in this court.
[EDITORS' NOTE: THE MAP IS ELECTRONICALLY NON-TRANSFERRABLE.], SEE 74 N.C. 579.]
Upon the hearing, it was ordered by the court that the injunction theretofore granted be so modified that the defendants be restrained from cutting the ditch mentioned in the complaint through the ridge which separates the waters of branch No. 1 and branch No. 2 to branches Nos. 2 and 3, but so much of the injunction as restrains the defendants from keeping open and cleared the said ditch which has already been cut by the defendants, be dissolved, etc. *Page 580 
From this order the plaintiff appealed.
His Honor, the Judge below, refused to vacate that part of the injunction which prohibited the defendants from continuing (778) their canal so as to turn the water of branch No. 2, (or morefield branch,) towards the plaintiff's land. The defendants did not appeal from the judgment in this respect, and we are not called on to examine it.
The principal question presented to us is, as to the right of the defendants to carry the water from branch No. 1 to or near the plaintiff's land. In considering this we are obliged to form some opinion as to the facts which are disputed between the parties, as it is upon these that their respective rights depend. These conclusions are, however, only provisional, and for the present purpose. It may be that on the final hearing, upon fuller evidence, the facts may appear to be very different from what, in our opinion, they now appear to be. We consider it proved with sufficient probability for the present purpose, that the natural flow of the water which finds its way into branch No. 1, is into Walker's swamp, (or Clayton's creek). Several witnesses acquainted with the locality, swear positively to this, and so far as we have seen, no witness swears that it passes over the land between the branch and the plaintiff's land. This view is supported by the admitted fact, that in order to conduct the water from the branch to the plaintiff's land, it was found necessary to cut the ditch six feet deep, and to dam up the branch below the point where the ditch departed from it. Taking this to be the fact, it will scarcely be contended that the defendants at common law, and in the absence of any license or grant of the right, have a right to divert a stream of water flowing in a part of its course through their land, from its natural course and outlet, and to conduct it to discharge itself upon the plaintiff's land, or into his ditches, to this damage. An owner may not use his property absolutely as he pleases. His dominion is limited by the maxim, "sic utere tuo ut alienum non laedas."
This maxim is so familiar, and the illustrations of it in decided cases are so numerous that any particular reference to them is unnecessary.
(779) The defendants allege that there is an ancient ditch running from branch No. 1, nearly in the direction of the one recently cut by them, and hence claim as we suppose a prescriptive right to their ditch. But when the right to an casement is claimed by long enjoyment from which a grant is presumed, the grant presumed is for the precise right which has been enjoyed, and long enjoyment of one ditch *Page 581 
can raise no presumption of a grant of a right to a ditch differing in any appreciable degree from that enjoyed, in locality or dimensions. It does not appear that the old ditch, remains of which were found on each side of the public road, ever carried down the water from branch No. 1, upon the lands of the plaintiff, or that it has been in a condition to do so within twenty years.
If, as seems to us upon the evidence to be the fact, the natural flow of the water of branch No. 1 is to Walker's swamp, the defendants have the right to cleanse it and restore it to that natural condition in which it once discharged, and may still discharge the injurious surplus of water from their lands. If that means of drainage shall from any cause be impossible, or extremely inconvenient, they may obtain a right to drain their lands into the ditches of the plaintiff or through his lands by the means prescribed by our Acts of Assembly.
Such being our opinion on the question as to the defendants' right to divert the branch, very few observations are necessary upon the right of the defendants over the surface water which falls upon their land, and which would naturally flow over the surface upon the lower lying lands of the plaintiff. It has been held that an owner of lower land, is obliged to receive upon it the surface water which falls on adjoining higher land, and which naturally flows on the lower land. Of course when the water reaches his land the lower owner can collect it in a ditch and carry it off to a proper outlet so that it will not damage him. He cannot however raise any dyke or barrier by which it will be intercepted and thrown back on the land of the higher owner. (780) While the higher owner is entitled to this service, he cannot artificially increase the natural quantity of water, or change its natural manner of flow by collecting it in a ditch and discharging it upon the servient land at a different place, or in a different manner from its natural discharge. These elementary principles being founded on reason and equity are common to both the civil and the common law, and are impliedly recognized by our Acts of Assembly respecting draining. They do not present any absolute or inequitable impediment to the drainage of higher lands through lower. If it be necessary (using this word in its legal sense) for the sufficient drainage of the higher lands, to collect the surface water in one or more ditches and carry it off through the lower lands, the higher owner may obtain a right to do so, on the just condition that he will not discharge the water on the lower land to its damage leaving the owner to get rid of it as best he may, but will at his own expense, conduct it through, and entirely from, the lower land to a proper outlet.
We have not given any attention to the alleged motives of the defendants. Their motives are immaterial. The question is only as to *Page 582 
their rights. The Judge erred in vacating any part of the injunction before a final hearing.
The Judge's order in vacating part of the injunction is reversed, and the injunction as to the whole of the ditch complained of is continued until the hearing. The plaintiff will recover the costs of this court.
Let this opinion be certified.
PER CURIAM. Judgment accordingly.
Cited: Staton v. R. R., 109 N.C. 341; Fleming v. R. R., 115 N.C. 696;Mizzell v. McGowan, 120 N.C. 138; Porter v. Armstrong, 129 N.C. 102;Mullen v. Canal Co., 130 N.C. 502; Davis v. Smith, 141 N.C. 109, 110;Clark v. Guano Co., 144 N.C. 76; Greenwood v. R. R., 144 N.C. 448;Briscoe v. Parker, 145 N.C. 17; Brown v. R. R., 165 N.C. 395, 396;Yowmans v. Hendersonville, 175 N.C. 578; Jackson v. Keans, 185 N.C. 419;Winchester v. Byers, 196 N.C. 384; Bonapart v. Nissen, 198 N.C. 183;Holton v. Oil Co., 201 N.C. 748; Darr v. Aluminum Co., 215 N.C. 771;Cotton Mills v. Henrietta Mills, 219 N.C. 283; Phillips v. Chesson,231 N.C. 569; Johnson v. Winston-Salem, 239 N.C. 704.
(781)