## CHICAGO, R. I. & P. Ry. Co. v. GROVES.

N. 1716, Okla. T.  Opinion Filed January 21, 1908.

(93 Pac. 755.)

1. NEW TRIAL—Grounds—Verdict Contrary to Law.  When the evidence on the trial establishes the fact so clearly and indisputably that the court may instruct the jury to bring in a particular verdict, but neglects so to do, and is not requested to do so, and the jury returns a verdict contrary to what the law demands, then and then only should the court set aside the verdict of the jury.

2. COURTS—Rules of Decision—Decisions as Precedents—Civil Law.  The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, in aid of the general statutes, being in force in this state, precludes the following of decisions based on the civil law as governing authority in this jurisdiction.

3. WATERS AND WATER COURSES—Riparian Rights—Unobstructed Flow—Common Law.  Where the common law prevails, every proprietor, upon water flowing in a defined channel, so as to constitute a water course, has the right to insist that the water shall continue to run as it has been accustomed, and no one can change or obstruct its course injuriously to him without being liable to damages.

4. SAME—Surface Waters—Diversion and Obstruction.  Surface water flowing naturally or falling upon the soil may be diverted in its course, and even thrown back on the dominant estate whence it came, but with certain qualifications.

5. SAME.  The exercise of such right by a lower proprietor must be reasonable, for proper purposes, in good faith, and with due care to inflict injury only when necessary.

6. **SAME.** The doctrine that the right may not be exercised wantonly, unnecessarily, or carelessly is common-law doctrine, resting upon the common law, as well as upon the civil law.

7. **SAME.** A class of cases, based upon the adoption of the old common-law rule, hold without qualification that no cause of action can arise from throwing back surface waters upon the land of the dominant estate; but this is not supported by the weight of common-law authority.

8. **SAME.** The weight of authority in England and in the United States, though the cases are often difficult to reconcile, supports the proposition that one must so use his own property with due regard to the rights of another.

9. **SAME.** Where the surface water has been accustomed to gather and flow along a well-defined channel, which by frequent running it has worn or cut into the soil, so as to have well-defined banks, it may not be obstruction to the injury of the dominant proprietor.

10. **SAME—What Constitutes Water Course.** Where the natural conformation of the surrounding country necessarily collects therein so large a body of water, after heavy rain or the melting of large bodies of snow, as to require an outlet to some common reservoir, and where such water is regularly discharged through a well-defined channel which the force of the water has made for itself, and which is the accustomed channel through which it flows or has ever flowed, it constitutes a water course or waterway.

(Syllabus by the Court.)

*Error from the District Court, Comanche County; before Frank E. Gillette, Judge.*

Action by Alva Groves against the Chicago, Rock Island & Pacific Railway Company for damages due to the overflow of land, caused by the negligent construction of defendant's roadbed. Judgment for plaintiff, and defendant brings error. Affirmed.

On the 17th day of February, 1903, Alva Groves, the herein defendant in error, as plaintiff, commenced an action in the probate court of Comanche county, in the territory of Oklahoma. Afterwards, on the 18th day of April, 1903, plaintiff filed his amended petition, and on the same day the plaintiff in error, the defendant in the court below, filed his answer, which was a denial of each and every allegation, except that the defendant was a cor-

poration. The case was tried in the probate court, and resulted in a judgment for the plaintiff, and was appealed to the district court. Thereafter, on the 21st day of October, 1904, the case was tried, and a judgment resulted in favor of the plaintiff for the sum of $443.75.

For cause of action the plaintiff's petition consisted of three paragraphs or counts. In the first count he alleged: That the defendant constructed a line of railway across his homestead in the month of May, 1902, and in constructing it threw up an embankment on said land "in crossing a draw or ravine thereon, which draw or ravine was in a natural water course created by the flow of surface water caused by the fall of rain in that community, and was and is the natural outlet for such water." That defendant in constructing said embankment failed to make a sufficient provision for the outlet of the water that might reasonably accumulate in said draw or ravine, but put in a small tiling, wholly insufficient to carry off said water, and that it accumulates about the track of said defendant after each heavy rain, and stands upon and covers for some length of time about 35 acres of plaintiff's land, killing all vegetation and making said amount of land valueless. He further alleged that the same was good agricultural land, and worth $11.25 per acre, or a total value of $393.75. That prior to the construction of said embankment said water course was unobstructed, and water did not stand upon said land, but naturally flowed off; and plaintiff alleges, as a result of said obstruction, the destruction of the whole value of said land, in the sum of $393.75. In the second count the same facts are alleged with reference to the building of the road, the obstruction of the ravine, the accumulation of the water, and the rendering of the land valueless, with the additional allegation that the said 35 acres of land rendered valueless extended in a strip almost the entire width of his homestead, thereby dividing the remainder of his homestead or claim in two parts, and damaging the balance of the homestead independent of the 35 acres which

were absolutely rendered valueless, in the sum of $200 additional. In the third count substantially the same allegations are made with reference to the construction of the road and the obstruction of the ravine, with the further allegation that on the 21st day of September the water which came down the draw or ravine was caused, on account of this construction of said embankment with insufficient outlet, to stand above the embankment, flooding 35 acres of 'he land to such an extent as to flow in his residence, a half dugout, a depth of four feet or thereabout, damaging the dugout to the value of $40, household goods to the value of $10, and wearing apparel to the value of $20, carrying away wood and posts to the value of $4, two saddles and three sets of harness to the value of $30, and injuring his well to the value of $50; also claiming damage to his pasture to the amount of $150, and causing the necessity of moving his fence, to his damage in the sum of $50. Plaintiff therein prayed judgment in the total sum of $947.45.

On the trial the plaintiff withdrew his claim for damages to the pasture, and limited his claim for damages from the overflow in September, 1902. The defendant on the trial admitted that the railroad company constructed the line or lines mentioned in the petition, and that it was, at the time of the trial, owned and operated by said railway corporation. On the part of the plaintiff, without objection on the part of defendant in error, he testified in his behalf that at the time of the institution of said action he was the owner of said land; that he, having homesteaded the same, had lived on the place ever since the 6th day of September after the opening, which was in August, 1901. On cross-examination plaintiff testified that he entered and filed on said quarter section of land under the homestead laws, and that he had proved up his claim. He further stated that he could not tell the date of his filing, but his best recollection was it was the 6th of September, 1901, and, further, that he had made no conveyance or mortgage to the same prior to the time of the alleged damage in 1902. It was admitted that plaintiff made no con-

veyance whatever to the railway company, but that the railway acquired right of way prior to plaintiff's homestead entry, and that the railroad embankment was constructed after plaintiff filed and entered upon said land. The testimony of plaintiff tended to show that the defendant's road and the embankment were constructed about May, 1902; that there were heavy rains, equal to the September, 1902, rain, causing the overflow in question, prior to the time of the construction of said embankment, but that the same, prior to the construction, did not flood or overflow the said land; that the embankment was 13 or 14 feet high and about 200 yards long, practically the entire width of the homestead; that the distance from said embankment to the head of said creek or ravine is about 3½ miles; that, after the overflow had reached to the channel, said ravine would run for several days; that the creek below the said road was something like it was above; that below the same the water spread out over the flat lands; that where they scraped dirt to make a fill the water was run around through the fill and on over a little bottom to the section line, the outside line of plaintiff's land; that, as a result of said overflows as a result of said embankment, said 35 or 40 acres had been rendered valueless for farming and grazing purposes; that for such purposes it formerly had a value ranging from $11.25 to $15 per acre; that said house or dugout was damaged in the sum of $40, household goods, $10, wearing apparel, $20, bridles, harness, and saddle, $21, and well in the sum of $50. The evidence on the part of the plaintiff tended to show that the tiling or sewer was not of such a size as might have reasonably been considered sufficient to carry off the volume of water that might naturally have been anticipated at time to flow through Snake creek or this ravine.

The testimony on the part of plaintiff as to the stream in question is as follows:

"Q. State whether or not there is any water course or ravine running through that land. A. Yes, sir; there is. Q. Has it

any name? A. Yes, sir; called 'Snake Creek.' * * * Q. Describe to the jury the nature of that ravine there, as to banks, how far from one bank to the other, and about the nature of the channel. A. Well, the channel some places is cut out deep and broad, and runs crooked, and it will go right across after it strikes a rocky place, and finally there will not be any channel there for a little ways. Q. State if there is any natural reason why it has not worn a channel in all the places. A. It is because the creek bed is crooked, and there is rock there, and when it reaches that rock it shoots right across. Q. How far is it to the head of this creek, or what is the lay of the land where it drains the water into the creek? A. It is about 3 miles—I mean to the head of the creek. Q. About 3 miles to the head of the creek? A. It drains about 3½ miles—I don't know exactly— right across there. Q. You may state the distance of the drain on either side of the channel. A. On the west side about a mile and a half a little northwest, and on the east about a mile and a half north and east. Q. State whether or not you lived there on this land prior to the construction of this railroad across it. A. Yes, sir; I did. Q. State whether or not, during the time you lived there, or prior to the construction of this road, there were any heavy rains. A. Yes, sir; lots of them. Q. State whether or not these rains overflowed your land. A. No, sir; nothing to amount to anything at all. Q. State whether or not, prior to the month of September, 1902, there were any rains. A. Yes, sir. Q. State what effect it had on your land, as to whether it flooded. A. Yes, sir; flooded about 35 acres. * * * Q. How deep is that creek? A. Some places it is over waist deep, and some places it is shallow. Q. Is it running now? A. No, sir. Q. How much of the time does it run? A. It don't run very much at a time. Q. Just after rains? A. Yes, sir; when it does run, it will probably run for a week or such a matter. I could not say exactly how long it does run. Q. Did you ever know it to run a week? A. Yes, sir. Q. That was a week when it had been raining a week? A. It had been raining some. Q. Rained for several days? A. Yes, sir; it rained quite a bit. Q. Where does the water come from that comes down that ravine? A. Part of it shoots down from the west side, and part of it from the east. Q. Is there not a little slough there in your land where the water stands? A. You mean Snake creek? Q. Yes, sir. A Yes, sir; there is water standing there in Snake

creek. Q. A little water hole? A. Pretty good-sized water hole; lasts the year around. Q. Did you ever see it last the year around?. A. It lasts the year around. * * * Q. Did you ever make a measurement of the height or depth of the creek? A. Do you mean how deep the creek is? Q. Did you ever actually measure that creek with a yard-stick or tapeline? A. No, sir. Q. Did you ever measure it with anything that was intended to measure height or distance A. No, sir; never measured it. Q. The creek has no channel all the way? I understood you to say it washes out the soil in some places where it is soft, and made little holes where it runs over? A. In some places there is a channel, and in some places there is not."

J. A. Vanderford, on the part of plaintiff, among other things, testified:

"Q. Is that creek straight or crooked? A. It is crooked. Q. Is that water course through there natural or artificial? A. It is a natural water course. * * * Q. You speak of pools of water along that ravine or depression there on plaintiff's land. How many pools of water are there there? A. I never counted them. Q. When was you there last? A. About a month ago. Q. Was water running then? A. No, sir. Q. Have you seen it since a month ago? A. No, sir. * * * Q. Well, now, do you know of any pools of water along there, except the one down close to the railroad track? A. Yes, sir; I know in particular of three. Q. When were they there? A. They were there about— I believe it is one year since I have been along there. Q. You say they were there a year ago? A. Yes, sir. Q. Was there any running water there at that time? A. No; not at that time. Q. How long since had there been any running water there at that time? A. That was sort of dry spell. I could not say just how long. Q. Is that a live stream that goes down through there? A. No, sir; I don't consider it a live stream. Q. When does the water run down there? A. After heavy rains. Q. Does the water that falls in that scope of country drain down through there? A. Yes, sir."

D. J. McCoy, on the part of defendant, testifies in part as follows:

"Q. What is the character, or what are the surface features, of plaintiff's land? A. When I first saw his land it was rolling

prairie draining from the west side gently toward the depression. Q. And how was the slope to the east of the depression? A. To the east of the depression on another gentle slant about the same way. Q. Describe that depression. A. It was a natural depression in the ground. I should call it a ravine. Taking clear across, it was an average of about 400 feet wide. There are no marked banks to this, or any known channel, otherwise than a few pockets of water, pools, and puddles. Q. You say there are no banks? A. Nothing I should call that. Q. How does the land lie? Does it slope from the lowest point out? A. No, sir; you might say that, in the lowest line of it, which is about 400 feet wide, that is just a wide slough—the way I would call it—or a ravine. Q. At the time of the construction of the railroad did the water stand in that slough? A. Yes, sir. Q. To what depth? A. We drove our teams into the middle sometimes; and the water never did at any time come over the hub. Q. How long was that slough? A. I should judge it was about 500 feet. Q. Were there any abrupt banks to it? A. No, sir. Q. How were the edges? A. The edges looked like the banks had simply broke away, and it had got into softer ground underneath. Q. How was the slope or rise or fall of the land from the outer edges of the slough each way? A. Gradual. Q. Now, between these banks of the slough, what was the formation? A. It seemed to be just the usual formation of the land; never noticed anything different. Q. Was there any channel there? A. No, sir Q. By what were those banks made? How were they formed? A. I couldn't say. All I know was that they appeared to me to be natural, or the water at some time had started a place under the grass roots. Q. How wide were these places? A. No more than 25 feet. Q. Any living water there? A. No, sir. Q. Any springs you know of? A. None that I know of. Q. What was between these banks you speak of (meaning banks of the pools)? Was there any channel? A. No channel at all; just natural ground and grass. Q. What was the character of the lowest place in there between those banks? A. Just seemed to be natural soil such as we found in building the dam. Q. Did you find it changed in that respect when you examined it after the flood? A. No, sir."

At the close of taking testimony in the case the defendant moved the court for an order to the jury to return a verdict in its

favor. Said motion was taken under advisement, and the record fails to show that it was ever ruled upon by the court, or that any exception was taken in regard to said motion whatever.

The following instruction, among others, was given to the jury:

"No. 3: The jury are instructed that, under the laws of this territory, 'every corporation, constructing, owning, or using a railroad shall restore every stream of water, watercourse, street, highway, plank road, toll or wagon road, turnpike, or canal, across along, or upon which said railroad may be constructed, to its former state, or to such conditions that its usefulness shall not be materially impaired, and thereafter maintain the same in such condition, against any effect in any manner produced by such railroad.' The provision of our statute here quoted is mandatory in its terms, and the failure to comply therewith in the construction of a line of railroad renders the person or corporation so failing liable to damages to any person injured by reason of such failure."

The plaintiff in error relies upon the following assignments or errors; (2) "That the court erred in refusing the peremptory instruction offered by plaintiff in error." (1) "That the evidence was insufficient to entitle the plaintiff to recover, for the reason that he did not show the existence of a watercourse or waterway." (3) "That the court erred in its instruction defining a watercourse." (4) "That the court erred in its instructions in assuming the existence of facts which were in issue." (5) "That the court erred in directing the consideration of the jury to overflow subsequent to the alleged overflow of September 2, 1902." (6) "That the court erred in instruction No 8, by submitting improper elements of damage." (7) "That the court erred in admitting incompetent evidence to show damage by the alleged destruction of the well." (8) "That the court erred in submitting to the jury the question of the amount of damages to land caused by the overflow." (9) "That by reason of the errors above enumerated the court erred in refusing to grant the plaintiff in error a new trial."

*M. A. Low, C. O. Blake, E. E. Blake, H. B. Low,* and *W. C Stevens,* for plaintiff in error.

*Cherryholmes & Norman,* for defendant in error.

WILLIAMS, C. J. (after stating the facts as above). It is contended by plaintiff in error that the evidence was insufficient to entitle the plaintiff below, the defendant· in error here, to recover, for the reason that he did not show the existence of a "water course" or "waterway." The defendant below moved the court to instruct the jury to. return a verdict in its favor. However, the motion was never acted upon, nor was there any exception reserved, either on account of the ·failure of the court to act or to sustain the same.

In defendant's motion for a new trial he alleges that the verdict was contrary to law, and not supported by sufficient evidence. The question, then, arises, when is a verdict contrary to law?

"Where the evidence on the trial establishes the fact so clearly and indisputably that the court may instruct the jury to bring in a particular verdict, but neglects to do so, and is not requested so to do, and the jury returns a verdict contrary to what the law directs in such a state of facts, then and then only can the court set aside the verdict of the jury." (Marshall's Kans. Trial Brief, p. 607, § 3080).

By this record the question is presented as to whether or not the obstruction of the servitude of the lower ·heritage to the injury of the owner of the dominant estate, subjects him to liability for the resulting damage. Some of the adjudicated cases seem to go to the full extent of the civil-law doctrine of the servitude of the lower tenement, holding that the superior or dominant tenement has the absolute right to the discharge of its surface waters on the lower, under all or any circumstances in the nature of a common easement. *Martin v. Riddle,* 26 Pa. 415; *Miller v. Laubach,* 47 Pa. 155, 86 Am. Dec. 521; *Ogburn v. Connor,* 46 Cal. 347, 13 Am. Rep. 213; *Kauffman v. Griesemer,* 26 Pa. 407, 67 Am. Dec. 437,

*Earl v. Dehart,* 12 N. J. Eq. 280, 72 Am. Dec. 395; *Martin v. Jett,* 12 La. 501, 32 Am. Dec. 120; *Butler v. Peck,* 16 Ohio St. 339, 88 Am. Dec. 452; *Mayor v. Sikes,* 94 Ga. 30, 20 S. E. 257, 26 L. R. A. 653, 47 Am. St. Rep. 132. However, the common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, in aid of the General Statutes of Oklahoma (section 4200, ·Wilson's Rev. & Ann. St. 1903), being in force in this state, we feel that we are precluded from accepting decisions based on the civil law as governing authority in this jurisdiction. Wherever the common law prevails, every proprietor upon water flowing in a definite channel so as to constitute a water course has the right to insist that the water shall continue to run as it has been accustomed, and that no one can change or obstruct its course injuriously to him without being liable to damages. With regard, however, to surface water not confined to marked channels or banks, there has been a recognized difference. At common law, for the purpose of drainage, construction, or any other lawful purpose, every proprietor had the right to elevate the surface of his own land, or to erect embankments whereby the natural flow of the water from the upper ground shall be stopped, without liability. However, as a result of new conditions and the loathness of the courts to apply principles or conditions to which they were not applicable, and not from any intrinsic force of the civil law as the rule of decisions, modifications or qualifications of the ancient common-law doctrine have been adopted.

Practically all of the common-law courts agree that the surface water, flowing naturally or falling upon the soil, may be diverted in its course, and even thrown back upon the dominant estate whence it came. But is this right absolute at the will of the lower proprietor, or must such exercise be reasonable, for proper purposes, and with due care to inflict injury only when it is necessary? The question of good faith and the manner of doing it are necessarily involved in determining whether or not such right may be exercised. When necessary, and with due care and regard

as to the rights of others, although injury may accompany its exercise, under the common law there is no relief. The doctrine that the right may not be exercised wantonly, unnecessarily or carelessly does not rest upon the civil law so much as upon the common law. *"Sic utere tuo ut alienum non laedas."* *Nininger v. Norwood,* 72 Ala. 281, 47 Am. Rep. 412; *L. R. & Ft. S. R. R. Co. v. Chapman,* 39 Ark. 463, 43 Am. Rep. 280; *Ill. Cen. R. R. Co. v. Miller,* 68 Miss. 764, 10 South. 61; *Sinai v. L., N. O. & T. Ry. Co.,* 71 Miss. 552, 14 South. 87; *Livingston v. McDonald,* 21 Iowa, 173, 89 Am. Dec. 563; *McClure v. City of Red Wing,* 28 Minn. 186, 9 N. W. 769; *Gillham v. M. C. R. R. Co.,* 49 Ill. 487, 95 Am. Dec. 627; *Rowe v. St. P., M. & W. Ry. Co.,* 41 Minn. 384, 43 N. W. 76, 16 Am. St. Rep. 708; *Porter v. Durham et al.,* 74 N. C. 778; *N. & W. R. R. Co. v. Carter,* 91 Va. 593, 22 S. E. 517; *Town v. Mo. Pac. Ry. Co.,* 50 Neb. 775, 70 N. W. 402.

A class of cases, based upon the adoption of the old common-law rule, hold without qualifications that no cause of action can arise in any case from throwing back surface waters upon the land of the dominant estate. *Gannon v. Hargadon,* 10 Allen (Mass.) 109, 87 Am. Dec. 625; *Dickinson v. Worcester.* 7 Allen (Mass.) 19; *Inhabitants of Franklin v. Fish,* 13 Allen (Mass.) 212, 90 Am. Dec. 194; *Parker v. Newburyport,* 10 Gray (Mass.) 28; *Flagg v. Worcester.* 13 Gray (Mass.) 601; *Pettigrew v. Village of Evansville,* 25 Wis. 223, 3 Am. Rep. 50; *Hoyt v. City of Hudson,* 27 Wis. 656, 9 Am. Rep. 473; *Taylor v. Fickas,* 64 Ind. 167, 31 Am. Rep. 114; *Barkley v. Wilcox,* 86 N. Y. 140, 40 Am. Rep. 519; *Morrison v. Bucksport & Bangor Ry. Co.,* 67 Me. 355.

However, in England and in many of the states, though the cases are often difficult to reconcile, the right under the common-law doctrine has been qualified. *Nininger v. Norwood,* 72 Ala. 281, 47 Am. Rep. 412; *Little Rock & Ft. S. R. R. Co. v. Chapman,* 39 Ark. 463, 43 Am. Rep. 280; *Carriger v. T. T. V. & G. R. R. Co.,* 7 Lea (Tenn.) 388; *K. C., M. & T. R. R. Co. v. Smith,* 72 Miss. 680, 17 South. 78, 27 L. R. A. 762, 48 Am. St. Rep. 579;

*Ill. Cen. R. R. Co. v. Miller*, 68 Miss. 764, 10 South. 61; *Boyd v. Conklin*, 54 Mich. 591, 20 N. W. 595, 52 Am. Rep. 831; *Sinai v. L., N. O. & T. Ry. Co.*, 71 Miss. 547, 14 South. 87; *Bowlsby v. Speer*, 31 N. J. Law, 354, 86 Am. Dec. 216; *McClure v. City of Red Wing*, 28 Minn. 186, 9 N. W. 769; *Rowe v. St. P., M. & M. Ry. Co.*, 41 Minn. 384, 43 N. W. 76, 16 Am. St. Rep. 708; *R. & A. Ry. Co. v. Wicker et al.*, 74 N. C. 226; *Porter v. Durham et al.*, 74 N. C. 778; *Adams v. Walker*, 34 Conn. 466, 91 Am. Dec. 742; *Town v. Mo. Pac. Ry. Co.*, 50 Neb. 775, 70 N. W. 402.

This qualification, being based upon that golden maxim of the common law that one must so use his own property as not to injure the rights of another, also finds expression in the civil law, in the words of Pothier: "Each of the neighbors may so do upon his own heritage what seemeth good to him, in such manner, nevertheless, that he doth not injure the neighboring heritage." If for any purpose of improving and cultivating his land the landowner raises or fills it so that the water which falls in rain or snow upon an adjacent owner's land, and which formerly flowed upon the first-mentioned parcel, is prevented from so doing to the injury of the adjacent parcel, the owner of the latter is without remedy. Washbourn on Easements (3d Ed.) § 353 *et seq.*

However, the improvement may not be made carelessly, but must be done with a just regard to the rights of others. *Bassett v. Salisbury Mfg. Co.*, 43 N. H. 569; *Swett v. Cutts*, 50 N. H. 439, 9 Am. Rep. 276; *Porter v. Durham*. 74 N. C. 767; *Raleigh & A. R. Ry. Co. v. Wicker et al.*, 74 N. C. 220; *Yazoo & Miss. V. R. R. Co. v. Davis*, 73 Miss. 678, 19 South. 487, 32 L. R. A. 262, 55 Am. St. Rep. 562; *Little Rock & Ft. S. R. R. Co., v. Chapman*, 39 Ark. 463, 43 Am. Rep. 280; *Jungblum v. M. N. U. & S. W. R. R. Co.*, 70 Minn. 156, 72 N. W. 971; *Sheehan v. Flynn*, 59 Minn. 436, 61 N. W. 462, 26 L. R. A. 632.

But the right thus qualified has also exceptions. One is that the owner of the land cannot collect the water into an artificial channel or volume and pour it upon the land of another to his

injury. *Davis v. Fry*, 14 Okla. 340, 78 Pac. 183, 69 L. R. A. 460; *Davis v. City of Crawfordsville*, 119 Ind. 1, 21 N. E. 449, 12 Am. St. Rep. 361; *City of Evansville v. Decker*, 84 Ind. 325, 43 Am. Rep. 86; *Patoko Township v. Hopkins*, 31 Am. St. Rep. 417; *Rychlicki v. City of St Louis*, 98 Mo. 497, 11 S. W. 1001, 4 L. R. A. 594, 14 Am. St. Rep. 651; *Fremont, etc., R. R. Co. v. Marley*, 25 Neb. 138, 40 N. W. 948, 13 Am. St. Rep. 482; *Chalkey v. City of Richmond*, 88 Va. 48, 14 S. E. 339, 29 Am. St. Rep. 730; 2 Dillon on Municipal Corporations, § 1051; Gould on Waterways, § 271.

Another exception to the right, which is practically converse to the foregoing exception, is that the owner of the land cannot interfere with the flow of surface water in a natural channel. Where the water has been accustomed to gather and flow along a well-defined channel, where, by frequent running it has worn or cut into the soil, it may not be obstructed to the injury of the dominant tenement. *Earl v. De Hart*, 12 N. J. Eq. 280, 72 Am. Dec. 395; *L. R. & F. S. R. R. Co. v. Chapman*, 39 Ark. 463, 43 Am. Rep. 280; *Rowe v. St P. Ry. Co.*, 41 Minn. 384, 43 N. W. 76, 16 Am. St. Rep. 706; *Sinai v. L., N. O. & T. R. R. Co.*, 71 Miss. 552, 14 South. 87; *Jungblum v. M. N. U. & S. W. R. R. Co.*, 70 Minn. 156, 72 N. W. 971; *Boyd v. Conklin*, 54 Mich. 590, 20 N. W. 595, 52 Am. Rep. 831; *N. & W. R. Co. v. Carter*, 91 Va. 587, 22 S. E. 517.

In *Norfolk & Western R. R. Co. v. Carter, supra*, the surface water on the land of the plaintiff prior to the building of the road escaped from it over what is now the right of way of the defendant railway company by natural channels into Clinch river, and the flow was obstructed by the failure of said defendant to construct the necessary channels under its roadbed, and consequently the plaintiff was damaged by the accumulation of water.

In the case of *Jungblum v. M. N. U. & S. W. R. R. Co.*, 70 Minn. 157, 72 N. W. 972, the "depression was the usual and natural course of channel along which the surface water was ac-

customed to flow before the roadbed was constructed for a mile or two east of the róadbed, and the channel bears marks of water having flowed through it. Whether this channel is a natural watercourse within the strict definition of the term we need not determine, for the evidence justifies the finding that it was the natural and usual channel for surface water, and afforded a reasonable way for the defendant to construct a culvert for the escape of the surface water without injury to any landowner."

In the case of *Boyd v. Conklin*, 54 Mich. 583, 20 N. W. 595, 52 Am. Rep. 831, it is said:

"The narrow definition of water courses as natural living streams, which appears in a few cases in the United States, is not an ancient or universal definition. On the contrary, water running in a natural or artifical bed is very frequently, if not generally, so regarded. But names are of small importance, inasmuch as the only consideration that need be looked at is the character and surroundings of the flowage. The following authorities recognize valuable rights in water, and some of them are spoken of expressly as water courses which are entirely distinct from natural living streams. 3 Woolrych on Waters, 146, 147; *Wright v. Williams,* 1 M. & W. 77; *Rawstron v. Taylor,* 11 Exch. 369; *Broadbent v. Ramsbotham,* 11 Exch. 602; *Beeston v. Weale,* 5 El. & Bl. 986; *Ivimey v. Stocker,* L. R. 1 Ch. App. 396; *Watts v. Kelson,* L. R. 6 Ch. App. 166; *Nuttall v. Bracewell,* L. R. 2 Exch. 1; *Holker v. Poritt,* L. R. 8 Exch. 107; *Taylor v. Corp. of St. Helen's* L. R. 6 Ch. Div. 264; *Magor v. Chadwick,* 11 Ad. & E. 571; *Chadwick v. Mardsen,* L. R. Exch. 284. * * * Whatever may be the rights of adjoining proprietors as to the use and diversion of waters, there is no right in any one, by raising artificial obstructions, to flood his neighbor's lands by stopping the escape of water that cannot escape otherwise."

In the case of *Earl v. De Hart*, 12 N. J. Eq. 280, 72 Am. Dec. 395, a water course is defined to be a channel or canal for the conveyance of water, particularly in draining lands. It may be natural, as where it is made by the natural flow of the water, caused by the general superficies of the surrounding land from which the water is collected into one channel, or it may be artific-

ial, as in the case of a ditch or other artificial means used to divert the water from its natural channel, to carry it from lowlands from which it will not flow from the consequence of the surface of the surrounding land; and if such water is regularly discharged through a well-defined channel, and is the accustomed channel through which it flows and has flowed from the time immemorial, it is an ancient natural water course.

In the case of *Sinai v. L., N. O. & T. Ry. Co.*, 71 Miss. 552, 14 South. 88, it is said:

"At the ancient common law every landowner fought and fenced against surface water as suited his necessities. It was a common enemy, with which the landowner dealt according to his own pleasure, for his own protection; but this strict rule had its origin when the soil was used for agricultural purposes, in that primeval day of the law's birth and growth, and a railroad corporation as a landowner was undreamed of. Now, with a network of railway lands spread all over the face of the country, we are called to deal, in the application of legal principles, with a condition of affairs not thought of. When every man fought surface water to suit his own fancy, still then, as now, the rule was that each must so use his own property as not to do unnecessary harm to another. Each proprietor has the right to the use and possession of his own soil; each has equality of proprietary rights, and upon each is imposed in organized society, regulated by law resting on mutual concession, reciprocal duties and correlative obligations. No one, natural or artificial, has the absolute dominion and unlimited control of his own lands. Blending these harmonious rules of the common law, and adopting them in their flexibility to the new order of society, we shall do no violence to either while we apply both to the case in hand."

In the case of *Town v. Mo. Pac. Ry. Co.*, 50 Neb. 771, 70 N. W. 403, the facts were as follows:

"A body of land—the plaintiff says about a section (640 acres), one witness says a half section, and others fix it at 200 or 300 acres—within the corporate limits of the city of Lincoln, including some of the improved portions of the city, and all platted or laid out in lots and blocks, etc., on a lot on which was the plaintiff's place of business, has such a surface conformation or

is sloped so that, in time of rains or melting of snows, any waters caused thereby flow toward and come together in a body at a place in what witnesses called a 'draw,' others a 'depression in the prairie,' and others a 'channel' or 'waterway,' having its course near the store of plaintiff, and in or directly across which an embankment was made by or for the railway company, and which stopped the flowage of waters in the channel. The company made a culvert by placing at the base of the embankment, in the course of which the surface waters had apparently taken their flow, a tile of the required length, and of an internal diameter of 24 inches."

The jury found from the foregoing state of facts that the "depression" in the land complained of was a water course or natural channel, with banks clearly defined; and the undisputed proof was that the water was surface water, and the verdict of the jury was sustained.

If the water, whether surface water or not, had been accustomed to gather and flow along a well-defined channel, although said channel may have been cut or worn into the soil by the frequent running or flowing of such surface water, yet the same could not be obstructed by the railway company; but it was the duty of said railway company, in the construction of its said road, to reasonably provide sufficient drainage and an outlet to carry off such water as might be reasonably expected to flow along said channel and through such drainage outlet, but, however, in such a manner to do no wrong to the servient tenement—in other words, to provide the outlet as near as reasonably practicable, so as to force the water off the servient tenement in like manner and in the same channel or place as it flowed prior to the construction of said embankment. From the foregoing it is evident that neither was the verdict contrary to the law nor was the defendant below entitled to a peremptory instruction in its favor.

This brings us to the third assignment of error, to the effect that the court erred in its instruction defining a water course. Said instruction was in words and figures as follows:

"The jury are instructed that the word 'water course,' as used

in the statute quoted in instruction No. 3, means such a course as that where the natural conformation of the surrounding country necessarily collects therein so large a quantity of water, after heavy rain or after the melting of large bodies of snow, as to require an outlet to some common reservoir, and when such water is regularly discharged through a well-defined channel which the force of the water has made for itself and which is the accustimed channel through which it flows and has ever flowed."

The plaintiff in error has no ground to complain of the same. It was sufficiently favorable to it. *Town v. Mo. Pac. Ry. Co.,* 50 Neb. 771, 70 N. W. 402; *Boyd v. Conklin,* 54 Mich. 583, 20 N. W. 595, 52 Am. Rep. 831, and authorities therein cited; *Jungblum v. M. N. U. & S. W. R. R. Co.,* 70 Minn. 157, 72 N. W. 971; *N. & W. R. R. Co. v. Carter,* 91 Va. 583, 22 S. E. 517; *Earl v. De Hart,* 12 N. J. Eq. 280, 72 Am. Dec. 395; *Sinai v. L. N., O. & T. Ry. Co.,* 71 Miss. 552, 14 South. 87.

In the same assignment of error plaintiff complains of the following instruction:

"The jury are instructed that, if they find from 'the evidence that the waterway through which plaintiff's land drains a large area of the surrounding country, about 3 to 3½ miles long, and 1 to 2 miles in width, and carries off, after heavy rains in its channel, large volumes of water, and that the drainage of the surrounding country is such as to cause rain falling thereon to run off very rapidly and accumulate in the waterway across plaintiff's land, which waterway is well defiend and the accustomed channel through which such water flows, and so marked as to present on casual ·glance to every one the unmistakable evidence of the frequent action of running water, such waterway is a water course within the meaning of the statute quoted in paragraph 3 of these instructions."

For the same reason, and under the same authorities, the plaintiff in error has no just ground for complaint.

The fourth assignment of error is unsupported by the record.

It is further contended in the fifth assignment of error that the court erred in directing the consideration of the jury to over-

flow subsequent to the alleged overflow of September, 1902. There is nothing in the charge of the court submitting any issue as to any overflow subsequent to the date alleged in the petition. There was testimony, however, introduced on the part of the plaintiff as to subsequent overflows, that was competent. Just as it was competent to introduce testimony as to whether or not there had been overflows of such land prior to the date of the construction of the embankment, in order that the jury might determine whether or not the overflow was the primary cause of the construction of the embankment, so it is in like manner competent to make proof as to subsequent overflows, in order that the jury might determine as to whether or not the defendant had exercised reasonable care in providing outlets to carry off water that might accumulate in said water course.

The seventh, eighth, and ninth assignments of error are without merit.

Let the cause be affirmed.

All the Justices concur.