## SUNRAY OIL CO. v. CORTEZ OIL CO.

No. 29636.    March 4, 1941.

Rehearing Denied April 8, 1941.

Application for Leave to File Second Petition for Rehearing Denied May 6, 1941.

*112 P. 2d 792.*

Edward Howell, of Oklahoma City, R. J. Roberts, of Wewoka, Paul E. Taliaferro, and Forney Hutchinson, both of Tulsa, and Busby, Harrell & Trice, of Ada, for plaintiff in error.

Marvin T. Johnson, of Tulsa, for defendant in error.

RILEY, J.   This is an appeal from a judgment and decree of the district court of Seminole county, enjoining Sunray Oil Company from using a well for disposal of salt water drilled for oil and gas on a tract of land in which Cortez Oil Company owned an undivided one-fourth mineral interest.

Prior to April, 1939, Burke-Greis Oil Company, and Rogers and Rogers, who held an oil and gas lease on the 80 acres, SE¼ of the NW¼ and the SW¼ of the NE¼ of section 12, township 6 north, range 5 east, in Seminole county, had drilled on the leased area a test well for oil and gas. (Southwest ten acres of the SW¼ of the NE¼ of said section.) The well was drilled through the formation known as the Cromwell sand, encountered at a depth of about 3,045 feet, and through the Wilcox sand, found at about 4,000 feet. No oil or gas was found, and the well was abandoned and was about to be

plugged. The Cromwell sand there was 105 feet thick and saturated with salt water. Sunray Oil Company obtained an assignment of the oil and gas lease covering the ten-acre tract upon which the well was located, also it obtained from Genevieve Greer, owner of the surface rights and 53/80 of the mineral interest, a license to use the well for the disposal of salt water produced from other wells in the vicinity.

Sunray Oil Company "plugged" the well back to the bottom of the Cromwell sand, cemented casing from the surface to about the top of the Cromwell sand, cleaned the well out and tested it for oil and gas, and found none. The well was "swabbed" out and salt water rose in it 1,800 feet.

Sunray Oil Company owned and was operating oil and gas wells some distance from this well which were producing salt water in considerable quantities and was disposing thereof by piping it into the well here involved, when Cortez Oil Company commenced this action to enjoin the Sunray Oil Company from so using said well.

Permanent injunction was granted, and Sunray Oil Company appeals.

On appeal Sunray Oil Company contends error in overruling its demurrer to the evidence and in overruling defendant's motion for judgment in its favor at the close of all the evidence, and error in granting the injunction, for the reason that the evidence does not show that the acts enjoined were in violation of plaintiff's legal rights.

Right of Cortez Oil Company herein is derived solely from its mineral grant.

A grantee in a mineral grant of the nature here involved does not acquire ownership of oil and gas in place. Oil and gas, unlike ore and coal, are fugacious and are not susceptible of ownership distinct from the soil. A grant of the nature of that of Cortez Oil Company is not a grant of the oil and gas in

the land, but of such part thereof only as the grantee may find and reduce to possession. It vests no title to any oil or gas which he does not extract and reduce to possession, and hence no title to any corporeal right or interest. Priddy v. Thompson, 204 Fed. 955.

It is now generally held that oil and gas are not capable of distinct ownership in place. Rich v. Doneghey et al., 71 Okla. 204, 177 P. 86; Cuff v. Koslosky, 165 Okla. 135, 25 P. 2d 290.

The right granted is that of ingress and egress, together with the right to use so much of the surface as may be necessary to explore for oil and gas, and if either be discovered, to reduce same to possession, whereupon such part of the oil as the grant may provide becomes the personal property of the grantee. This right, however, is subject to legislative control against waste. Rich v. Doneghey, supra. This right of the Cortez Oil Company was not exclusive. The same right is shared by the owner of the land. All other rights to the land and the use thereof remain in the owner. The rights acquired by Cortez Oil Company were not terminated. Sunray Oil Company expressly agrees that Cortez has the same right to use the land for the same purpose as it, and even the same well, subject to payment of reasonable share of expense.

But Cortez Oil Company asserts that there is a possibility that oil or gas may be found in some other sand under said 80-acre tract, and possibly in the same sand at locations other than the one in the particular ten acres where the well in question is located, that the act of Sunray Oil Company in placing salt water in the well might possibly result in the salt water escaping into other formations containing oil or gas and might force such oil or gas from said land, and might likewise force such oil or gas as might exist in the same sand at some other location from said land, and thus prevent Cortez Oil Company from ever

finding or producing oil or gas under its mineral grant.

The question is whether the judgment or decree granting the permanent injunction is clearly against the weight of the evidence.

There is no substantial conflict in the evidence as to what has been done in an effort to produce oil from the land in question and from land in the vicinity.

The oil field known as the North Grayson field, so far as oil or gas has been produced, lies south and east, principally south of the 80 acres in which plaintiff has its interest. Numerous expert witnesses, geologists, petroleum engineers, and experienced producers of oil and gas, testified in the case. The expert witnesses all agree a "fault" extends along the northwest line of the producing area, running in a southwest to northeast direction from near the center of section 14, slightly over a mile southwest from the well in question, northeast and crossing near the southeast corner of the 80-acre tract involved, and thence northeast for some distance. (A "fault" is defined by some of the witnesses as a break in the formation where one part of the strata has moved without respect to the other part of the formation.) In other words, a formation of a given kind is found at one depth on one side of the "fault line," and at another depth on the other side. A number of wells had been drilled north and west of the so-called fault line. In some wells the Cromwell sand was encountered at various depths ranging around 3,100 feet. In those to the south and west it was found at a slightly higher level, and in those drilled to the northeast on the northwest side of the fault line it was found at a slightly lower level. In other wells further northwest the Cromwell sand was not found.

The well involved herein was drilled a short distance north and west of the fault line. No oil or gas was found in any of the wells drilled north and west of the "fault line."

South and east of the fault line numerous wells have been drilled to what is known as the "Simpson Dolomite" formation, encountered there at about 3,800 feet. No Cromwell sand was found in any of the wells drilled south and east of the fault line.

It appears clearly, and all the expert witnesses agree, that there is no possibility of finding oil or gas in the Cromwell sand or any formation connected therewith on the 80-acre tract, unless it be found in what is known as a "trap." That is a place where the sand has formed in a dome, higher than the common level, sealed above by an impervious formation and below by the salt water. Whether such a formation exists within the 80-acre area is a matter of speculation.

The expert witnesses do not agree on what might happen, if such a "trap" exists, by placing additional salt water in the "disposal" well. Expert witnesses for Cortez Oil Company say that it might drive the oil or gas out of such a "trap." The expert witnesses for Sunray Oil Company say that this would be impossible for the reason that if such "trapped" oil or gas does exist it must be already sealed off from below by the existing salt water, and that additional salt water would have no effect.

The evidence is that the "bottom hole pressure" in the disposal well plugged to the bottom of the Cromwell sand was about 900 pounds to the square inch. Since salt water weighs something of .45 pounds to each foot in depth, this indicates that the place where the salt water enters the Cromwell sand formation in the area north and west of the fault line must be about 2,000 feet higher than the bottom of the Cromwell sand at the place where the disposal well is located. From this it clearly appears that the theory of defendant's expert witnesses on this question is more reasonable than that of plaintiff's witnesses, for the reason that if such "trapped" oil exists, it must have been forced into

the "trap" by pressure of the salt water in the past, and must have been effectively sealed in the "trap" by impervious formation above and the pressure of the salt water from below. Running additional salt water into the Cromwell sand formation could do no more than raise the general water level within the area and thus raise the pressure of the salt water below.

Since the only interest of Cortez Oil Company in the land itself is the right to explore for and produce oil or gas therefrom, plaintiff cannot be injured on the theory of forcing "trapped oil or gas" from such "traps" if any exist, and such existence is purely speculative.

Another question upon which the expert witnesses disagree is the possibility of salt water escaping through the fault line into other sand either above or below the Cromwell formation from which oil or gas might possibly be produced and forcing out such oil or gas as might exist.

Cortez Oil Company's expert witnesses testify there is a possibility that salt water placed in the "disposal" well might find its way to the fault and up or down the fault line into the other sand. Sunray Oil Company's expert witnesses testify there is no such possibility, that in the Mid-Continent field fault lines are generally impervious and no water ever finds its way up or down such fault lines.

In this case the lower and upper sands north and west of the fault line have been thoroughly tested and no oil or gas has been found. It seems that if it were possible for salt water to pass down the "fault" into the lower sand, that would already have been done. Salt water with a pressure of 900 pounds already existed in the Cromwell sand northwest of the fault. If the fault were pervious, this enormous pressure would probably have long since forced the salt water existing in the Cromwell sand into lower sand formations having contact with the fault line. This would in measure be true as to higher sands up to 2,000 feet above the Cromwell sand.

The oil from wells in the North Grayson pool southeast of the fault line is produced from what is known as the Simpson Dolomite, found at about 3,800 feet. This is 700 feet lower than the Cromwell sand formation found northwest of the fault line. It is from this formation that Sunray Oil Company is producing oil and from which the salt water comes that is sought to be placed in the disposal well.

If this salt water comes through the fault line from the Cromwell sand north and west of said line, it was coming through before defendant placed any salt water in the disposal well.

There is one location at the extreme southeast corner of the 80-acre tract where it is said to be possible that Cortez Oil Company might drill a producing well. This is south and east from the line where the fault line passes through the southeast ten acres of the 80-acre tract. Such a well would have to be drilled near the fault line and on the southeast side thereof. Oil probably would not be there found in the Cromwell sand for the reason that it has been proved that no Cromwell sand exists south and east of the fault. The only possible source for oil at that location would be in the Simpson Dolomite. Salt water already exists in that formation. If the theory of plaintiff's witnesses, that salt water might pass down and through the fault into the Simpson Dolomite formation and force therefrom any oil that may be therein, be accepted, and, if this were possible, the Cromwell sand northwest of the fault being already fully saturated with salt water, it would follow that salt water would have already permeated into the Simpson Dolomite formation and forced all the oil therefrom. It is apparent, however, that this is not true, because the oil has not as yet been forced out of the Simpson Dolomite formation, since plaintiff and others are producing oil (and salt water) therefrom.

It is apparent, then, that if any oil is to be found at the location mentioned, there is no connection between the

Cromwell sand formation found on the northwest side of the fault line and the Simpson Dolomite formation found southeast of said fault line.

From the record as a whole it clearly appears that there is no probability that any possible oil-producing formation exists in the land in question which would be materially affected to plaintiff's detriment by the use of the well in question for the disposal of salt water by defendant.

In Tidal Oil Co. et al. v. Pease et al., 153 Okla. 137, 5 P. 2d 389, in discussing the question of disposal of salt water, it is said:

"Subject to the rules of law with reference to due care, the owner of land ought not to be prohibited from the full use and benefit of his land so long as he does not by such use injure or damage other persons."

So in this case Genevieve Greer, being the owner of the land, subject only to the oil and gas lease, and subject to the one-fourth interest in the oil and gas and other mineral rights owned by plaintiff, has the right to so use the surface and substrata of her land as she sees fit, or permit others so to do, so long as such use does not injure or damage other persons.

"An injunction will not issue to protect a right not in esse and which may never arise, or to restrain an act which does not give rise to a cause of action. . . ." 32 C. J. 34.

A complainant is not entitled to an injunction where the alleged damage is merely nominal, theoretical, or speculative. 32 C. J. 50.

As a general rule complainant must establish as against defendant an actual substantial injury. 32 C. J. 49; Duggan v. City of Emporia, 84 Kan. 429, 114 P. 235.

In Simons et al. v. Fahnestock et al., 182 Okla. 460, 78 P. 2d 388, it is held:

"It is not sufficient ground for injunction that the injurious acts may possibly be committed or that injury may possibly result from the acts sought to be prevented; but there must be at least a reasonable probability that the injury will be done if no injunction is granted, and not a mere fear or apprehension of same."

The facts necessary for granting relief by injunction must be established at least by a preponderance of the evidence.

It is said that the right to the injunction must be established "with certainty"; that the evidence must be "clear," "clear and convincing," "clear and satisfactory"; that the right must be supported by the "clearest" proof, etc. 32 C. J. 350.

Summed up, the various statements as to proof necessary, as shown by the cases cited in the text, are in substance that every material fact essential to authorize the issuance of an injunction must be established to a reasonable certainty, or at least a reasonable probability, by clear, convincing, and satisfactory evidence, and the injunction should be denied where the evidence is such as to leave in doubt the existence of any fact necessary to authorize the issuance of the injunction.

Plaintiff cites a number of cases in support of its claim that the injunction was rightfully granted. But in every case cited, all the essential facts were sufficiently established.

In the instant case the alleged injury anticipated by plaintiff which it seeks to have enjoined is highly speculative, uncertain, and imaginary.

Plaintiff has failed to prove to any degree of certainty or probability that it will be injured in any way by the acts of defendant of which it complains.

From the record as a whole, the evidence is insufficient to support the decree.

The judgment and decree are reversed, with directions to dismiss.

WELCH, C. J., and OSBORN, BAYLESS, GIBSON, and DAVISON, JJ.,

concur. ARNOLD, J., concurs specially. CORN, V. C. J., and HURST, JJ., dissent.

ARNOLD, J. (specially concurring). A mineral deed creates a separate, limited estate in the land. The Cortez Oil Company, therefore, has a limited estate in the land and has co-equal rights with the fee owner to the extent of the limited purposes set forth in the mineral deed. Both the fee owner and the Cortez Oil Company have a right to the use of the land, the Cortez Oil Company being limited by the purposes set forth in its deed. Both the fee owner and the Cortez Oil Company can protect this right from invasion and damages by the other or his assigns or any third person. The fee owner can permit such a special use by the Sunray Oil Company as herein involved so long as such use does not impair the limited estate of the Cortez Oil Company. The ownership of oil and gas in place is not involved herein. The only question presented here, therefore, is whether the evidence introduced by the Cortez Oil Company is sufficient to show that its estate will be damaged by such special use.

I think the opinion is correct in holding that said evidence is speculative and does not show even a probability of damage to the Cortez Oil Company, and that, therefore, injunctive relief should have been denied.