Harold C. THOMAS, James E. McGuire, Indian Interprises, Inc., and Utopia Mountain Festival, Petitioners,

v.

Honorable Don H. HAMPTON, District Judge, Judicial District 10, Respondent.

No. 52668.

Supreme Court of Oklahoma.

Aug. 30, 1978.

C. Jack Maner, Tulsa, for petitioners.

William Hall, Dist. Atty., Osage County, Pawhuska, for respondent.

BARNES, Justice:

In the spring of 1978, Mr. Howard C. Thomas and Mr. James E. McGuire began preparations to conduct a music festival, the Utopia Mountain Festival, on land belonging to Mr. McGuire, located a few miles outside of Pawhuska, Oklahoma.

The festival, which was to feature entertainers such as David Allan Coe and Black Oak Arkansas, was to start at noon on Sunday, September 3, 1978, and conclude at 11:00 p. m., of the same day. In preparation for the festival, the petitioners have had 30 acres of Mr. McGuire's land fenced in with a 7-foot high chain link fence, have arranged for catering services, have arranged for portable toilet facilities, water facilities, removal of both solid and liquid waste, as well as for staging equipment, lights, and the entertainers. To date, petitioners have spent in excess of $23,000.00 and are committed to spend a great deal more.

On August 4th of this year, William Hall, District Attorney for Osage County, filed an action on behalf of the State seeking to enjoin petitioners from holding the festival. After a hearing on the matter, respondent Trial Judge, the Honorable Don H. Hampton, issued a permanent injunction restraining the petitioners from operating, supervising, maintaining, consenting to, advertising or promoting in any fashion the Utopia Mountain Festival, or similar function, on or about the 3rd day of September, 1978, on or about petitioner McGuire's land.

As the usual appeal procedure, because of the time limitation involved, would clearly not offer a remedy to the petitioners, they have petitioned this Court asking us to assume original jurisdiction, arguing that the Trial Court, under the facts presented, abused its discretion, by enjoining the production of the music festival in its entirety.

■ As the injunction was issued on August 11th, and the activity being enjoined is scheduled to take place September 3rd, it is axiomatic that the appeal procedure, the only ordinary remedy at law available to the petitioners, is totally inadequate. For this reason, we assume original jurisdiction to consider the case.

In *O'Laughlin v. City of Fort Gibson*, 389 P.2d 506 (Okl.1964), which involved a suit to enjoin the proposed construction of a sanitary sewage treatment facility, we stated:

"To enjoin a threatened nuisance, it must appear that the injury would be irreparable in damages, and the evidence must be clear and convincing, not of a possibility or apprehension, but of reasonable probability, that the injury will be done." [Quoting from Syllabus No. 3.]

Similarly, in *Sunray Oil Co. v. Cortez Oil Co.*, 188 Okl. 690, 112 P.2d 792 (1941), in which this Court set aside an injunction granted by the Trial Court, we stated:

"It is said that the right to the injunction must be established 'with certainty'; that the evidence must be *'clear', 'clear and convincing', 'clear and satisfactory'*; *that the right must be supported by the 'clearest' proof*, etc. 32 C.J. 350.

"Summed up, the various statements as to proof necessary, as shown by the cases cited in the text, are in substance that *every material fact essential to authorize the issuance of an injunction must be established to a reasonable certainty, or at least a reasonable probability, by clear, convincing and satisfactory evidence, and the injunction should be denied where the evidence is such as to leave in doubt the existence of any fact necessary to authorize the issuance of the injunction.*" [Emphasis added]

█ In the case before us, the evidence supporting the total prohibition of the music festival fell far short of being clear and convincing. In fact, most of the evidence presented was highly speculative in nature, and did not warrant the issuance of an injunction, totally preventing petitioners from producing the festival.

In seeking the injunction, the State, speaking through District Attorney Hall, argued that the production of the festival would create health and safety hazards, both at the festival site and in the surrounding community.

Mr. John H. Armstrong, a registered professional sanitarian employed by the State Department of Health, testified that the portable toilets, waste removal facilities, and the catering accommodations were more than adequate to provide for the number of possible ticket holders at the festival. Additionally, at the cost of $22,000.00, petitioners have hired one hundred security guards to aid in crowd control, man the gates, and maintain order.

Likewise, the emergency medical facilities planned, barring a major catastrophe, the occurrence of which is highly unlikely and highly speculative, were said to be adequate. The only person to testify who had experience with outdoor music festivals was Larry Shaffer, who has produced many shows of this type, and has been involved in the production of approximately five hundred outdoor concerts. He testified that the most serious injury at any show he ever produced was a broken ankle, and that in all the shows he has produced the largest number of spectators that ever needed medical attention was approximately twenty, and that no individual at any concert ever required hospitalization. In light of this testimony, the only testimony which was not purely speculative in nature, the medical facilities to be provided, a mobile first-aid station, manned by a doctor or intern, and three registered nurses, clearly appear adequate.[1]

The State also complained that the production of the festival would create undue fire hazards in the surrounding vicinity. First, witnesses for the State testified that the parking of automobiles in fields upon petitioner's land would, because of the heat of catalytic converters, create a hazard of fire, particularly in light of the fact of high grass in those fields. Countering this testimony was testimony of the petitioners, that they intended to first allow cattle to graze on the land involved, then mow and blade, then rake the area, so that the grass would be as low as possible on the day of the festival. Additionally, petitioners indicated that they would have six cattle-spraying trucks filled with water available to help control any fire that should occur. Although complete plans to man all six trucks had not been made at the time of trial, petitioners indicated that if desired such would be done.

Secondly, the State argues that petitioners' use of water from the lines of the Pawhuska Water District will lower the water pressure in two residential areas, thus making it more difficult to fight a fire,

---

1. The two promoters of the show, Mr. Thomas and Mr. McGuire, initially had the responsibility of attempting to acquire the aid of local doctors and nurses to provide the medical services involved. However, the initial arrangements made by Mr. Thomas and Mr. McGuire were not adequate. At the time of trial, no definite arrangements had been made, but Mr. Shaffer, who was initially acting as a consultant, but later had been hired as a production manager, testified that he could easily provide the medical facilities planned, as he has developed a working relationship with doctors and nurses in the Tulsa area during his many years as a producer in that area.

and creating the possibility of total loss of water, should consumption at the festival be heavy. Even if an injunction were called for because of this possible danger, certainly less prohibitive measures could have been taken by the Court, which would have both allowed the festival to continue and at the same time lessened the hazards involved. Additionally, we would point out that petitioners testified that they could, if necessary, provide adequate water through the use of water tanks and trucks, and not utilize the drinking facilities already installed and connected to the Pawhuska water lines.

Additionally, the State argued that any campfires in the vicinity might also constitute a fire hazard. Testimony indicated that it could be expected that some spectators might arrive the day prior to the festival and wish to camp in the fields on petitioner's land adjacent to the fenced-in festival site. As it could be anticipated that some of these campers might wish to cook, the camping activities would create a fire hazard. Assuming that to be the case, any hazard could have been eliminated and/or greatly reduced without totally prohibiting the festival. The Court could have simply required all land involved to be bladed and cut; the Court could have required other precautions to be taken, and/or the Court could have provided that no camping be allowed.

Similarly, any health hazards which might have confronted the campers, such as lack of toilet facilities and water, could have been corrected by lesser restrictions than total prohibition of the festival. In this connection, we note that all toilet, water and facilities provided by the promoters were inside the fenced-in perimeters of the actual festival grounds, and none was planned outside in the fields, where camping would, if allowed, take place. Again, any health hazards involved could have been eliminated or greatly reduced by requiring that toilet and water facilities be provided for campers.

Lastly, the State argued and presented evidence showing that the production of the festival as planned would cause congested highways in the surrounding vicinity. There can be no doubt that those attending the festival, as those attending similar events such as football games, do cause congestion on the highways. Although the local Sheriff's department may not be equipped to handle such congestion, the Highway Patrol, aided by security personnel provided by the promoters, if desired, could minimize the problems inherent in heavy use of the highways. The testimony indicated that the Highway Patrol had requested forty-five troopers to aid in traffic control for the festival, and that other security personnel would be available to aid the Highway Patrol. Although at the time of trial, the Highway Patrol did not know how many troopers would be assigned to the area, the testimony indicated that the Patrol intended to furnish as many officers as it could. We would also note here that similar congestion, though perhaps not as heavy in recent times, has been tolerated in the vicinity of Pawhuska for many years. For example, each year both the Cavalcade and the Ben Johnson Roping Contest bring thousands of participants to the Pawhuska area.

In conjunction with this issue, there was great speculation in the testimony regarding how many spectators might attend the festival. The testimony indicated that thirty thousand tickets were printed, but that many tickets were printed to enable all those selling tickets in various parts of the State to maintain an adequate supply. One of the promoters explained that if the number of tickets printed was only equal to the number of spectators reasonably expected, it would be necessary for them to keep shuffling those tickets from site to site as one ticket seller ran out and would have to replenish his supply with tickets from another seller who had not sold as many tickets. The only estimate of the crowd which had any probative value was that made by Mr. Larry Shaffer, who, as mentioned above, had a great deal of experience with such festivals. He testified that it was part of his business to be able to make a fairly accurate estimate of the attendance at his

concerts and festivals. The evidence offered at the trial indicated that Mr. Shaffer had not, in all the years he had produced concerts, underestimated attendance at any concert. With this "track record" in mind, we note that Mr. Shaffer indicated that it was his professional opinion that the festival would attract possibly ten thousand people, and no more than fifteen thousand. He also testified that traffic conditions at prior similar festivals did not constitute a substantial hazard, though he admitted that traffic conditions at each festival, giving different surroundings, varied from festival to festival. The evidence offered by the State suggesting massive traffic tie-ups was highly speculative, and based on little or no past experience. In fact, the evidence indicated that large crowds in the past, attracted by such events as the Cavalcade and the Ben Johnson Roping Contest, had not constituted a major traffic hazard, although they certainly had precipitated congested highways and some inconvenience.

As the only non-speculative damage shown, arising from the high volume of traffic which might be attracted to the festival, was short-term inconvenience to those attending the concert and those in the surrounding vicinity, we cannot say, on an equitable basis, that such inconvenience justified the injunction imposed.

Since none of the evidence, which was non-speculative, demonstrated that the production of the festival would result in serious and irreparable damages, not compensable in money damages, we hold that the Trial Court abused its discretion in totally enjoining the festival. However, the Trial Court would have been justified in taking less restrictive measures. In reviewing the testimony, we find that the State's most urgent complaint was that the petitioners had not made final arrangements for many of the facilities which they indicated would be provided, such as final arrangements for the medical staff on hand, and for cattle sprayers, and personnel to man them full time.

**2.** Here, time does not allow us to remand the case to the Trial Court for consideration of less restrictive measures, as the festival is sched-

■ Due to the shortness of time,[2] we will not remand to the Trial Court for imposition of less restrictive measures, but will impose the following conditions as a prerequisite to the petitioners' being permitted to proceed with the production of the festival:

1. All land of petitioner upon which automobiles will drive or park, or upon which camping is permitted, must be cut and/or bladed as low as possible, then raked, between the date of this order and prior to the opening of the festival facilities.

2. Because of the loss of water pressure and water in surrounding residential areas which would occur, should the petitioners be allowed to tap into the Pawhuska water line, we require that the petitioners furnish drinking water by means other than the use of the Pawhuska water system. In determining the amount of water necessary for the anticipated crowd, petitioners are to consult the State Health Department and furnish the quality and quantity of water required by that Department.

3. That petitioners either not allow camping on their land, or, if they do, they are to provide sufficient water and toilet facilities for two hundred. Additionally, should camping be permitted, no open fires are to be allowed.

4. Should the decision be made not to allow camping, we require that all advertising and promotional materials, distributed or aired after that decision, clearly indicate that camping will not be allowed.

5. We require that at least one medical doctor be present in the first-aid station, and that he be aided by at least three registered nurses. Additionally, petitioners are required to have three ambulances and three drivers, all to be on hand from the time the gates open until the crowd dispenses.

uled to take place within a few days, and if the petitioners are to have any hope of completing preparations, they must begin immediately.

6. Petitioners are to coordinate their efforts with the Oklahoma Highway Patrol, and cooperate with the Patrol in minimizing the inconvenience caused by the heavy use of the roads in the vicinity of the festival.

7. The petitioners, as planned, are to have at least one hundred security personnel on hand from the time the gates open until the crowd is dispersed.

8. Because of the traffic hazards inherent in the unusually heavy use of the local, winding, two-lane highways at night, we require the petitioners to end the festival at 8:00 p. m., so as to depart during sunlight hours.

9. That the fenced-in area have at least ten clearly marked emergency exits.

For the above stated reasons, the judgment of the Trial Court is modified as set out above, and the cause is remanded to the Trial Court for enforcement in harmony with this opinion.

ORIGINAL JURISDICTION ASSUMED, INJUNCTION MODIFIED, AND CASE REMANDED.

HODGES, C. J., LAVENDER, V. C. J., WILLIAMS, IRWIN and DOOLIN, JJ., and LESTER REYNOLDS, Special Justice, concur.

SIMMS, J., concurs in part and dissents in part.

CORNISH, Special Justice, dissents.

The Honorable TOM CORNISH was assigned to act as Special Justice in this case, filling a vacancy on the Court. The Honorable LESTER REYNOLDS was also assigned to act as a Special Justice in this case, serving instead of Mr. Justice BERRY, who certified his disqualification.