WEST EDMOND SALT WATER DISPOSAL ASS'N et al. v. ROSECRANS et al.

No. 33712. July 11, 1950.
Rehearing Denied Oct. 3, 1950.

*226 P. 2d 965.*

Appeal Dismissed Feb. 26, 1951.
See 71 S. Ct. 500.

10

Earl Pruet and T. Murray Robinson, Oklahoma City, for plaintiffs in error.

Walace Hawkins, Dallas, Tex., and W. R. Wallace, Oklahoma City, for Magnolia Petroleum Company.

Wm. C. Liedtke, Russell G. Lowe, and Redmond S. Cole, Tulsa, for Gulf Oil Corporation.

Ralph W. Garrett and Robert L. Imler, Tulsa, for Sinclair-Prairie Oil Company.

Don Emery, Rayburn L. Foster, R. B. F. Hummer, and R. M. Williams, Bartlesville, and Harry D. Turner, Oklahoma City, for Phillips Petroleum Company.

W. H. Brown, Oklahoma City, for Anderson-Prichard Oil Corporation.

George Hazlitt, Cleveland, Ohio, for Sohio Petroleum Company.

D. A. Richardson and Cantrell, Carey & McCloud, Oklahoma City, for defendants in error.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, First Asst. Atty. Gen., amicus curiae.

LUTTRELL, J. This action was brought by L. T. Rosecrans and others as plaintiffs against the defendant the West Edmond Salt Water Disposal Association, and the oil companies composing such Association, all of whom were engaged in the production of oil in what is known as the West Edmond oil field. The amended petition of plaintiffs contained five causes of action. The first cause was for ejectment; the second for injunction to prohibit a continuing trespass by defendants upon the land of plaintiffs; the third for a money judgment for mesne profits; the fourth for damages temporary in character to the land of plaintiffs, and the fifth for exemplary or punitive damages. The trial court overruled defendants' demurrer to the evidence as to the first, third, and fifth causes of action, and their motion for directed verdict at the close of all the evidence, and submitted the case to the jury on the first, third, and fifth causes of action, withdrawing from the consideration of the jury the second cause of action, which sought an injunction, and sustaining the demurrer to the evidence as to the fourth cause of action. The jury returned a verdict for plaintiffs on the first, third, and fifth causes of action, but the verdict on the fifth cause of action for exemplary damages was, on motion for new trial, disallowed by the trial court, and judgment upon said fifth cause of action rendered in favor of defendants. Defendants appeal from the judgment of the trial court on the first and third causes of action, and plaintiffs cross-appeal from the action of the court in disallowing the verdict for exemplary damages.

Plaintiffs' amended petition in their first cause of action alleged that plaintiffs were the owners of a 160-acre tract of land located in Oklahoma county, and within the area of what is known as the West Edmond Oil Field

or pool; that the defendants were injecting salt water in great quantities in a well located in the center of a 40-acre tract adjoining the land of plaintiffs on the west, and that the salt water so injected into said well was forced through the porous stratum into which it was injected and carried in an easterly direction into the stratum underlying the land of plaintiffs; that in so doing the defendants took the property of plaintiffs in said subsurface structure for their own benefit as a reservoir for the said salt water, and occupied the stratum to the exclusion of plaintiffs, and to their detriment. In the first cause of action they asked that the defendants be ejected from their land and the possession thereof restored to the plaintiffs. In their second cause of action they sought to enjoin the defendants from continuing to inject salt water into said well. In their third cause of action they alleged that defendants had become liable to the plaintiffs for the mesne profits, or profits accruing to defendants by reason of the taking and detention of plaintiffs' land by forcing the salt water into it, and prayed for recovery of such profits. In their fourth cause of action they alleged that the acts of the defendants had resulted in physical damages to the property of plaintiffs, which could be remedied by the use of labor and money, and asked for the reasonable expense of restoring the property in the sum of $25,000. In the fifth cause of action they asked for punitive damages for the wanton, arbitrary and oppressive disregard of the rights of plaintiffs by the defendants.

In their answer defendants admitted that they were injecting salt water into said well, after having obtained the permission of the Corporation Commission and the State Planning and Resources Board to do so; denied that the salt water had migrated or percolated into the property of the plaintiffs, and further alleged that if, from the proof, it appeared that salt water injected into said well had migrated into the stratum into which it was injected and under the land of plaintiffs, that no damage or injury was sustained by plaintiffs by reason thereof for the reason that the stratum into which the salt water was injected was saturated with salt water long prior to the time the defendants began the injection of salt water into said well. In their reply plaintiffs alleged that the Corporation Commission and the Planning and Resources Board were without legal power, authority, and jurisdiction to make any order which would deprive plaintiffs of their constitutional or legal rights asserted in this action, and that if given such effect said orders were void as violative of the Constitution of Oklahoma and the Constitution of the United States, and that the defendants were estopped to claim that said orders precluded recovery by plaintiffs.

From the evidence and the admissions of the parties it appears that the West Edmond Salt Water Disposal Association is a joint association composed of the individual oil companies also made defendants in the action, and perhaps other oil companies, all of whom were producing oil in the West Edmond Oil Field or pool; that one of these defendants, Sohio Petroleum Company, held an oil and gas lease on the property of plaintiffs, upon which property no well had been drilled; that immediately west of the property of plaintiffs, in the center of a 40-acre tract adjoining the land of plaintiffs, was located an abandoned oil well known as the Robson well, and that defendants purchased from the owners of that land the right or permission to inject into said dry and abandoned well, in a stratum or formation known as the Hoover-Tonkawa formation, salt water piped to said dry and abandoned well from other wells operated by defendants in the West Edmond field, which were producing salt water in considerable quantities along with oil and gas. From the evidence it further appears that this Hoover-Tonkawa formation was a porous sand formation or series some 500 feet thick underly-

ing the 40-acre tract upon which the abandoned well was located, and underlying also the land of plaintiffs and the entire West Edmond oil field, said formation being 4,500 feet below the surface of the land; that said formation was completely saturated with salt water, and that no oil or gas was being or could be produced therefrom.

It also appears that the abandoned well had been so plugged and cemented that all oil sands below and above the Hoover-Tonkawa formation were protected from the salt water injected into said well, so that there was no possibility that the injection of salt water into it would in any way injure any other formation or strata in said field from which oil or gas or fresh water was being or could be produced. The salt water was injected into the abandoned well with considerable force. The salt water encroachment on the West Edmond field, so far as the Hoover-Tonkawa formation was concerned, came from the west, so that any movement in the water confined in said formation would be toward the east, and the testimony of plaintiffs' witnesses was that the injection of the salt water into the abandoned well caused a further or more accelerated movement of the salt water from the west to the east, so that a considerable portion of the salt water so injected would find its way under the land of plaintiffs. According to one witness almost half of the salt water so injected would migrate or percolate into the formation under the land of plaintiffs, displacing a similar amount of salt water which would be pushed further east. Plaintiffs did not give the defendants permission to so push or force their salt water into the formation under plaintiffs' land, but before the Corporation Commission and at all other times objected to the injection of salt water into said formation by defendants.

The evidence shows that the salt water in the Hoover-Tonkawa formation was confined to that formation by impervious shale or clay formations immediately above and below it, so that salt water contained in said formation could not seep or percolate into the strata above or below the said formation, and that the said formation was saturated with salt water and was of great extent, the actual boundaries thereof not being capable of accurate ascertainment. At the time of trial, June 9, 1947, the witnesses testified that the total volume of salt water injected into the well was some 4,156,370 barrels. One of the witnesses for plaintiff testified that this amount was trifling when compared to the vast amount of salt water contained in the Hoover-Tonkawa formation, testifying that it was comparable to dropping an eyedropper full of water into the ocean.

The plaintiffs produced no evidence tending to prove actual damages to their land or interference of any kind with the full use and enjoyment of the land by them. By one witness they offered to prove that the forcing of salt water into the said formation might eventually produce erosion and result in the cutting of channels or canals in the formation so that there would be a leakage of salt water from this formation to the sands below them. This offer was denied by the trial court. It is conceded that the defendants had not invaded, trespassed upon, or taken possession of the land of plaintiffs, or any portion thereof, save and except by the injection of salt water into the said formation and its migration or percolation into that portion of the formation which underlies the land of plaintiffs.

The decisive question presented for determination is whether the owner of land, who injects, through a well upon his premises, salt water into an underground stratum which contains nothing but salt water, which salt water so injected, commingling with the salt water in said stratum, migrates or percolates into the portion of said stratum underlying the land of his neighbor, thereby trespasses upon the lands of his neighbor, or takes wrongful pos-

session of the portion of such stratum underlying the land of his neighbor, so as to become liable to his neighbor therefor, although no actual damage is inflicted upon or suffered by his neighbor, nor is he deprived of any right pertaining to, or consistent with, the full and complete use, occupation, or enjoyment of his land.

While it is true that the defendants in this action do not own the land upon which the Robson well is located, they have a derivative right to inject salt water into said well, and the standard of the legality of their act is the extent of the right of the owner of the land who granted such right to them. Smith v. Stanolind Oil & Gas Co., 197 Okla. 499 172 P. 2d 1002.

We say this is the decisive question presented, since all the contentions of the plaintiffs in this action, as enumerated above and set forth in their various causes of action, are based upon or claimed to arise from what they contend is a trespass upon and taking possession of their land or a portion thereof by the injection of salt water in the Robson well, and its subsequent migration under the land of plaintiffs.

The question is one of first impression, not only in this court, but in the courts of last resort of the United States. Counsel frankly state that their research has failed to disclose any case decided by any court of last resort determinative of this question, and we have failed to find any. The case has been exhaustively briefed and orally argued by the parties. The Attorney General of the state has filed a brief amicus curiae on behalf of the state, calling attention to the large production of salt water as a necessary incident to the production of oil and gas; the detriment to the state and its citizens occasioned by permitting this salt water to get into the streams, lakes or fresh water strata in the state; the fact that underground disposal in salt water bearing formations is rapidly becoming a common practice in oil producing states, and is the most logical and sensible solution of the problem of salt water disposal, and stating that if such disposal of salt water is forbidden unless oil producers first obtain the consent of all persons under whose lands it may migrate or percolate, underground disposal would be practically prohibited. The defendants and the Attorney General unhesitatingly admit and affirm the liability of the defendants or other oil producers disposing of salt water by injection into underground formations for any actual damage or injury resulting therefrom to adjoining property owners. But they assert that the mere injection of salt water in the Robson well, and its migration into the salt water bearing formation underlying the land of plaintiffs, does not in itself, absent any injury or damage to the land of plaintiffs, or any deprivation of their right to use, occupy, and enjoy their lands, constitute an unlawful or wrongful trespass upon or taking possession of the land of plaintiffs or any portion thereof in such fashion that plaintiffs could maintain ejectment against them, or could maintain an action for mesne profits, or could enjoin them on the theory of a continuing trespass. They assert that the only liability of the defendants is a liability for actual damage or injury to the land of plaintiffs, or the deprivation of some right previously vested in plaintiffs to use, occupy, and enjoy their property fully and completely.

Careful consideration of the authorities cited in the briefs of the respective parties, and other authorities examined by us, convinces us that the contention of the plaintiffs is untenable; that the defendants have not trespassed upon the land of plaintiffs, nor taken possession of any part thereof, nor deprived the plaintiffs of any right in the full and complete possession and use of their property, and that the contention of defendants that they are liable only for actual damage suffered by plaintiffs resulting from the injection of salt water into said well must be sustained.

The contention of plaintiffs is apparently bottomed upon the assumption that the salt water injected into the Robson well by defendants, being at that time the property of defendants, remained their property after it was injected into said well and after it was commingled with the salt water already contained in the Hoover-Tonkawa formation, and that when, by migration or percolation, it passed beyond the boundaries of the land upon which the Robson well was located and entered that portion of said formation which underlay the land of plaintiffs, it still remained the property of defendants, and that thereby defendants, without the consent of plaintiffs, used the land of plaintiffs as a storage place or reservoir for salt water belonging to defendants. Based upon this assumption they contend that they were entitled to a judgment ejecting the defendants from the possession of their property, and giving to the plaintiffs damages measured by the profits or saving received or effected by defendants, resulting from the storing of their salt water upon the lands of plaintiffs instead of disposing of it otherwise.

Under all the authorities we have been able to find upon the subject, the assumption that the salt water remained the property of defendants after it permeated or penetrated into the Hoover-Tonkawa formation underlying the land of plaintiffs is incorrect. In Willis' Revision of Thornton on the Law of Oil and Gas, vol. 1, p. 78, §40, the author, quoting from Westmoreland v. DeWitt, 130 Pa. 235, 18 Atl. 724, 5 L. R. A. 731, says:

" 'Water and oil', said the court, 'and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals ferae naturae. In common with animals, and unlike other minerals, they have the power and tendency to escape without the volition of the owner. Their "fugitive and wandering existence within the limits of a particular tract is uncertain". They belong to the owner of the land and are part of it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone.' "

In Tiffany on the Law of Real Property (3d Ed.) vol. 3, p. 176, §746, the author says:

"When percolating waters escape and go into land, or come into another's control, or reach a natural channel, whatever rights the owner of the land from which they passed may have had in them, because in his land, are ordinarily lost."

To the same effect are 67 C. J. p. 834, §250; 56 Am. Jur. p. 594, §112; Rock Creek Ditch and Flume Co. v. Miller, 93 Mont. 248, 17 P. 2d 1074. In this respect water resembles oil, gas, or any other mineral fluid in nature, or of such character that by a well drilled on one tract of land it may be drawn from adjoining lands and become the property of the owner of the well when reduced to his possession.

Plaintiffs urge that this rule of law governing minerals of a fugacious nature should not be applied to deleterious substances, but should apply only to valuable minerals, and that the application of this rule to salt water and similar substances, which may be disposed of by one landowner by forcing it upon or into the land of another, is abhorrent to any sense of justice. We are unable to see why value should be a criterion for the application of the rule announced in the above authorities to fugacious substances. And further, if the formation into which such valueless substance is injected is already filled with a similar or identical valueless substance, a portion of which is displaced by the water migrating from the lands of the defendants into and under the lands of the plaintiffs, we are unable to see where any injustice has been done to plaintiffs, or the value of their property or their rights in their property in any wise diminished. If the substance were

of value they could, by penetrating the formation with wells drilled upon their own land, acquire the ownership of such substance, although it originally came from the land of defendants. Hammonds v. Central Kentucky Natural Gas Co., 255 Ky. 685, 75 S. W. 2d 204; Utah Copper Co. v. Stephen Hayes Estate, 83 Utah 545, 31 P. 2d 624.

In the latter case the Utah Copper Company removed from its mines great quantities of low grade copper ore which it deposited upon its own land adjacent to a gulch or ravine extending down the mountain side. This copper ore was soluble in water and rains and snows falling upon the piles of ore and saturating them carried away considerable quantities of the ore in solution, and seeped and percolated to other lands owned by the Copper Company, where the waters were recaptured and the ore extracted therefrom. The defendants in that action owned a small tract of land between the mining property of plaintiffs and the property belonging to them where the water containing the soluble ore was recaptured, and the Copper Company sought to condemn this property so as to prevent the owners thereof from capturing the water carrying the ore in solution, claiming that the water at all times remained the property of the Copper Company, regardless of the fact that for a part of the distance between the mine and the place where the water was recaptured it percolated under the land of the defendants. The Utah court denied the right of the Copper Company to condemn the land, saying:

"It is settled law in this state, and, so far as we know, it is the law everywhere, that the ownership of such waters is vested in the owner of the soil through or in which they seep and percolate. This is so because they are a part of the land itself."

Citing numerous authorities. The mere fact that a fugacious substance is not valuable does not justify us in making it an exception to the general rules governing the migration and ownership of such substances.

Plaintiffs call attention to Butler v. Frontier Telephone Co., 186 N.Y. 486, 79 N.E. 716, as supporting their right to maintain ejectment, and their contention that the defendants are in wrongful possession of their property. In that case the defendant Telephone Company, without permission from the plaintiff, strung a telephone wire across the plaintiff's premises, and the court held that the plaintiff was entitled to judgment for the removal of said wire and that ejectment was a proper remedy; that the maintenance of said telephone wire across his land deprived him of the full and complete possession thereof, since he was the owner of the land from the center of the earth to the sky above, and that the maintenance of said wire, the property of defendant, across his property without his consent was to that extent possession of his property. The distinguishing feature in this case is that the telephone wire at all times remained the property of the defendant, while in the instant case the water, when it escaped from the land upon which the well was situated and entered the land of plaintiffs, ceased to be the property of defendants.

In Canada v. City of Shawnee, 179 Okla. 53, 64 P. 2d 694, a case involving the right of the city to draw fresh water from under the land of plaintiff by the drilling of wells near his property and taking the water for its own use to the injury and damage of the water supply of plaintiff, it was not necessary to determine whether there was ownership in place of percolating water, or that ownership thereof was dependent upon reducing it to possession, since actual injury and damage was sustained by Canada. We there said:

"If the theory of ownership of percolating water is that of ownership in place, it is self-evident that the de-

fendant should be enjoined. If the theory is that of ownership by capture, such as is usually applied in exploration for oil, it still is not at all necessary that we blindly follow such theory to such extremes as will lead to gross injustice to innocent persons. We make no attempt to reconcile the result herein with the law of oil and gas, other than to point out that if oil had been sucked from beneath plaintiffs' property their land as land, and their farms as farms, and their live stock, and their personal health and sanitation could not have thereby become impaired, while the opposite must happen if they are deprived of water. And still less are we inclined to countenance such a result when the life-giving water, so extracted, is pulled from beneath the neighbor's land for sale at a distance."

In Sunray Oil Co. v. Cortez Oil Co., 188 Okla. 690, 112 P. 2d 792, Cortez sought to enjoin Sunray from disposing of salt water by injecting it into an abandoned well upon a tract of land in which Cortez owned an interest in the minerals. In that case Cortez did not show any actual damage to its mineral interest, but argued that there was a possibility that the salt water placed in the disposal well might find its way into an oil or gas bearing sand, which would result in injury to the mineral interest of Cortez. We held that the evidence failed to show any probability that any possible oil or gas producing formation existed in the land in question which would be materially affected to the detriment of Cortez by the injection of salt water into the well. In that case, referring to the rights of the owner of the land, we said:

"In Tidal Oil Co. et al. v. Pease et al., 153 Okla. 137, 5 P. 2d 389, 393, in discussing the question of disposal of salt water, it is said: 'Subject to the rules of law with reference to due care, etc., the owner of land ought not to be prohibited from the full use and benefit (of his land) so long as he does not by such use injure or damage other persons.'

"So in this case Genevieve Greer, being the owner of the land, subject only to the oil and gas lease, and sub-ject to the one-fourth interest in the oil and gas and other mineral rights, owned by plaintiff, has the right to so use the surface and substrata of her land as she sees fit, or permit others so to do, so long as such use does not injure or damage other persons."

Plaintiffs also rely upon article 2, sec. 23, of the Constitution, providing that no private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, citing City of Muskogee v. Hancock, 58 Okla. 1, 158 P. 622; Fairfax Oil Co. v. Bolinger, 186 Okla. 20, 97 P. 2d 574; British-American Oil Producing Co. v. McClain, 191 Okla. 40, 126 P. 2d 530, and other authorities. In all these cases, however, actual physical damage to the property of plaintiffs was shown, such as injury due to vibration caused by the drilling of a well for oil and gas, or by explosions in the laying of pipe lines or sewers, or detriment to and reduction of the usable value of their property, because of annoyance and inconvenience to the property owners or their tenants due to noxious odors. In these cases we held that where such damage or injury was shown recovery could be had under the constitutional provision whether the use of defendant's property causing the injury was negligent or not, or was reasonable or unreasonable, if damage was occasioned to the plaintiff's property thereby. As stated above, defendants admit and agree that in the event their injection of salt water into the well should in any way injure or damage plaintiffs, they would be liable in damages for such injury, and plaintiffs would be entitled to recover therefor. In the instant case, plaintiffs did not contend, and made no effort to prove, that any damage had resulted to them by the injection of salt water into the Robson well.

In Martin v. British-American Oil Producing Co., 187 Okla. 193, 102 P. 2d 124, the oil company constructed a pipe line from the Oklahoma City oil field to a point in the North Canadian

river near the land of plaintiff and discharged into the Canadian river large quantities of water. The trial court instructed the jury that the act of defendants in pumping excess water into the river was not itself an unlawful act, and became unlawful only when done in such a manner as to constitute an unreasonable use of the river and the proximate cause of injury to the rights of another. We held that the instruction was correct. We there approved the rule stated in Chicago, R. I. & P. R. Co. v. Groves, 20 Okla. 101, 93 P. 755, and other cases, that every proprietor of land through which water flowed in defined channels so as to constitute a water course had the right to insist that the water should continue to run as it has been accustomed, and that no one can change or obstruct the course of such stream injuriously to such landowner without being liable in damages. We held that it was well settled that it was the right of a riparian owner to have the stream substantially preserved in its natural size, flow, and purity, and that he was entitled to protection against material diversion or pollution of the water of such stream. We said in that case that the issue was not whether the defendants lawfully or unlawfully pumped excess drilling water into the river, but whether the water so pumped carried with it drilling mud, base sediment and other deleterious materials which formed a dam in the river and caused the water to wash away and destroy plaintiffs' land.

In the instant case, conceding that the salt water injected into the Robson well would migrate into the Hoover-Tonkawa formation under the land of plaintiffs, the only effect of such migration, according to the testimony of plaintiffs' own witnesses, was to displace a similar amount of salt water in said formation and cause it to migrate further east. Under this testimony, the formation being already saturated with salt water, the acts of defendants did not increase the amount of salt water under plaintiffs' land or render it any more deleterious or detrimental to plaintiffs' land than it had been before. If, instead of being contained in an underground stratum, the salt water in the Hoover-Tonkawa formation had formed a large nonnavigable lake covering in part the lands of defendants and plaintiffs, and other lands in the vicinity, and the defendants had upon their own land pumped additional salt water into said lake, which did not raise its level, or occasion any injury to plaintiffs, or damage to their property, but simply displaced a certain amount of salt water in the lake which was carried away by the outlet therefrom, could it be said that plaintiffs as owners of the bed of the lake in front of their lands had been deprived of the possession of the lake bed owned by them, or that the act of defendants in running salt water into the lake upon their own premises was a trespass upon or invasion of the possession of plaintiffs? We think not. Under the facts in this case there was no taking or damaging of the property of plaintiffs which would bring them within the provisions of art. 2, section 23, of the Constitution.

The applicable and governing principle in this case is the rule of reasonable use, that is, that a person may use his property in any lawful manner, except that he must not use it so as to injure or damage his neighbor. In City of Muskogee v. Hancock, supra, it is stated as follows:

"The general rule that no one has absolute freedom in the use of his property, but is restrained by the co-existence of equal rights in his neighbor to the use of his property, so that each in exercising his right must do no act which causes injury to his neighbor, is so well understood, is so universally recognized, and stands so impregnable in the necessities of the social state, that its vindication by argument would be superfluous."

This principle was announced and adhered to in British-American Oil Producing Co. v. McClain, supra; Sunray Oil Co. v. Cortez Oil Co., supra, and Chicago, R. I. & P. R. Co. v. Groves, supra. Measured by this rule, we find that the act of the defendants in injecting salt water into said well was lawful, and that in the exercise of such right defendants did not take the property of plaintiffs or any part thereof, or injure or damage same, or deprive the plaintiffs of any rights in connection therewith. This being the case, there was no basis or foundation upon which plaintiffs could maintain any of the causes of action asserted in their petition, and the motion for directed verdict made by the defendants at the close of all the evidence should have been sustained.

Reversed, with directions to set aside the verdict of the jury and render judgment for the defendants.

DAVISON, C. J., and WELCH, GIBSON, HALLEY, JOHNSON, and O'NEAL, JJ., concur.