[No. B065018. Second Dist., Div. Six. Apr. 20, 1993.]

GUS CASSINOS et al., Plaintiffs and Respondents, v.
UNION OIL COMPANY OF CALIFORNIA et al., Defendants and
Appellants.

1772

## COUNSEL

Hanna & Morton, Edward S. Renwick, Allison L. Malin and David C. Karp for Defendants and Appellants.

Bright & Brown and Gregory C. Brown for Plaintiffs and Respondents.

## OPINION

**STONE (S. J.), P. J.**—Union Oil Company of California et al. (Union) appeals from the $5,298,198 judgment of the trial court for injecting offsite wastewater into the mineral estate owned by respondents, Gus Cassinos et al.[1] We affirm, except for part of the prejudgment interest awarded by the trial court.

Before 1917, Escolle owned the subject property in fee simple absolute. In 1917, Escolle deeded the surface estate to E. Righetti.[2] Escolle very broadly and specifically reserved to itself the mineral estate.

In 1946, Escolle entered into an oil and gas lease with Union. In 1980, successor Escolle TIC entered into a revised oil and gas lease with Union which was amended on January 1, 1983. Pursuant to these leases, Union drilled various oil and gas wells on the subject mineral estate, including one known as A-16 which produced small quantities of oil and gas.

During the early 1980's, Union developed an excess wastewater problem on adjacent property it owns. This wastewater hindered production of Union's oil and gas on that property. Union determined that its best solution to this problem would be to inject the water into A-16 on the Escolle lease.

Union obtained permission to do so from Righetti, the owner of the surface estate of the Escolle property. Union also obtained a permit from the State Division of Oil and Gas to do so. In its application to the state, Union declared, inter alia, that the wastewater will come from several leases, *including the Escolle lease.* All of the wastewater, however, came from Union's offsite sources.

Union never sought permission from the Escolle TIC to inject its wastewater into A-16. In July 1984, Union began to inject this water into A-16

---

[1] Gus Cassinos et al. are the successors in interest to the previous owners of the land, the Escolle Estate Company (Escolle), and they are referred to herein as the Escolle TIC or as Escolle.

[2] The E. Righetti named in this action is the successor to the original grantee and is a nominal defendant here.

through pipes it laid across the surface of the Escolle property from its adjacent land.

On July 1, 1985, respondents filed a complaint to halt Union from injecting this water into the Escolle mineral estate. The complaint sought declaratory and injunctive relief, as well as damages under theories of subsurface trespass, nuisance and quasi-contract. The gist of the complaint is that Union injected its offsite wastewater into Escolle's reserved mineral estate through A-16 in contravention of the terms of the lease provisions and without Escolle's permission. Union's lengthy injection activities caused injury to the mineral estate and to Escolle's reservation of rights under deed to produce minerals, oil and gas in the field and to its right to use the disposal capacity of that field.

The trial court bifurcated the liability and relief issues. On stipulated facts, the trial court found that the Escolle TIC "own the entire mineral fee . . . pursuant to the 1917 deed. They own not only the oil and gas, but also the hard rock mineral, surface rights [subject to those granted to Righetti] and the right to dispose of waters related to the extraction of minerals on the property."

The injection of the wastewater by Union into A-16 interfered with and adversely affected these rights exclusively owned by the Escolle TIC as successors in interest under the 1917 deed. Union could not have drilled A-16 without benefit of the lease from the Escolle TIC, and no express or implied right to inject offlease wastewater exists under that lease or otherwise. Righetti's successors, under whom defendant now claims, "could not grant [this right] to defendant in the 1984 agreement upon which defendant now bases its right to inject waste water."

The wastewater Union injected into A-16 spread and communicated with other oil-producing lease wells in the unusual fractured shale Escolle formation, although the extent of migration is "largely impossible to predict."

Because Union intended to inject its offsite wastewater into A-16 for a nonlease purpose, thereby causing the water to interfere with and adversely affect the mineral rights owned by the Escolle TIC, Union committed trespass. Accordingly, the trial court held Union liable to the Escolle TIC for damage to its mineral rights in the lease area and barred Union from injecting such offsite wastewater into respondents' mineral zones.

In its trial brief for the damages phase of this case, Escolle argued that the correct measure of damages is "the fair market value of the disposal rights

taken by Union." Escolle stated that the usual measure of damages for a continuing or permanent trespass is the reasonable rental value of the use of the property. (Civ. Code, § 3334.) Typically, that value is the reasonable rental value during the period of wrongful occupation of the property. (See generally *Lindberg* v. *Linder* (1933) 133 Cal.App. 213, 218-219 [23 P.2d 842]; *Murphy* v. *Nielsen* (1955) 132 Cal.App.2d 396, 399 [282 P.2d 126].) But, this is a unique case.

Here it is impossible to trace the entire migration or effect of the waste-water injected. Thus, the exact amount of injury to the mineral estate is difficult to ascertain.

Escolle argued that because Union intentionally trespassed into the mineral estate to solve its offlease wastewater disposal problem and to benefit its other, offsite mineral holdings, the appropriate measure of damages under these circumstances is the cost to dispose of the wastewater injected during the pertinent period. This theory of damages sounds in quasi-contract, a remedy sought in its complaint. Thus, Escolle maintains that the benefit to Union from this trespass is the proper measure of damages. We agree.

Escolle established that the fair market value of such rights was $1.75 per barrel of water disposed. Oil operators, including Union, paid this price in this area during the pertinent period of time. Escolle also argued it is entitled to transportation costs of between 68 and 72 cents per barrel.

At the end of the relief phase of trial, the trial court concluded, inter alia, "that defendant Union has committed a trespass upon the property rights of plaintiffs and the measure of damages to be applied in this case is set forth in Civil Code Section 3334 . . . ."

The trial court determined that the fair market value of disposing of wastewater was $1.75 per barrel, exclusive of transportation costs. Union injected 2,067,343 barrels of offsite wastewater into A-16 between June 1984 and April 1986, when Union voluntarily stopped disposing of this water there. The trial court found that the Escolle TIC plaintiffs are entitled to judgment against Union in the principal sum of $3,617,843.

In addition, the trial court concluded that the Escolle TIC are entitled to prejudgment interest in the amount of $1,680,355, under both Civil Code section 3287, subdivision (a), and Civil Code section 3288, because the damages are capable of being made reasonably certain and the interest would make them whole. (*Howe* v. *City Title Ins. Co.* (1967) 255 Cal.App.2d 85 [63 Cal.Rptr. 119]; *Bare* v. *Richman & Samuels, Inc.* (1943) 60 Cal.App.2d 413

[140 P.2d 895]; *Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86 [160 Cal.Rptr. 733, 603 P.2d 1329]; *In re Pago Pago Aircrash of January 30, 1974* (C.D.Cal. 1981) 525 F.Supp. 1007, 1016.) The trial court determined the total judgment to be the sum of $5,298,198 and costs of suit.

## DISCUSSION

Three issues are before us on appeal: 1. Did the trial court correctly hold Union liable in trespass for interfering with and damaging the mineral estate reserved by Escolle? 2. If so, did the trial court use the proper measure of damages? and 3. Did the trial court properly award prejudgment interest to Escolle?

### *Liability*

■ The parties urge this court to consider who owns the right to inject offsite wastewater into A-16 for a purpose other than operating the Escolle mineral lease. Because Union injured the mineral estate owned by Escolle under deed without Escolle's consent, Union committed trespass. Therefore, we need not decide who owns the injection right, which would be a question of first impression in the State of California. (See generally *Rozewski* v. *Simpson* (1937) 9 Cal.2d 515, 520 [71 P.2d 72]; *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1].)

■ "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." (*Civic Western Corp.* v. *Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 16 [135 Cal.Rptr. 915].) "[A] trespass may occur if the party, entering pursuant to a limited consent, i.e., limited as to purpose or place, proceeds to exceed those limits by divergent conduct on the land of another. 'A conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with.' [Citation.]" (*Id.*, at p. 17; accord, *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1141 [281 Cal.Rptr. 827].)

■ In particular, causing subsurface migration of fluids into a mineral estate without consent constitutes a trespass. (See generally *Tidewater Oil Company* v. *Jackson* (10th Cir. 1963) 320 F.2d 157, 163, holding oil and gas lessee liable for intentional, nonconsensual flooding operations which caused damage to neighbor's lease; see also *Hancock Oil Co.* v. *Meeker-Garner Oil Co.* (1953) 118 Cal.App.2d 379 [257 P.2d 988], holding that slant drilling which drains a pool of oil owned by another on adjacent parcel constitutes subsurface trespass.)

In cases involving grants and reservations of mineral rights, our Supreme Court has stated that "[t]he rules of law should be sufficiently adaptable to reach a desirable result in this developing field of the law." (*Callahan v. Martin* (1935) 3 Cal.2d 110, 126 [43 P.2d 788, 101 A.L.R. 871].) (3) Deeds dealing in the transfer of oil interests "must be construed as a whole in the light of the circumstances under which they were executed and the expressed intent of the parties at that time." (*Dabney-Johnston Oil Corp. v. Walden* (1935) 4 Cal.2d 637, 651 [52 P.2d 237].)

For example, in *Dabney-Johnston*, after our Supreme Court noted the general rule that nonproducing cotenants "are generally subject to a charge or deduction for their proportion of drilling and operation expenses," it stated that "*the general rule is controlled by such agreement of the parties, express or necessarily implied.*" (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d at p. 657, italics added.) "Also, a reservation in a grant is to be interpreted in favor of the grantor . . . ." (*People* ex rel. *Dept. Pub. Wks.* v. *Ward* (1968) 258 Cal.App.2d 15, 21 [65 Cal.Rptr. 508]; Civ. Code, § 1069.)

In *Brookshire Oil Co.* v. *Casmalia Etc. Co.* (1909) 156 Cal. 211 [103 P. 927], the Supreme Court considered a dispute between an oil and gas lessee and a parol licensee over the right to lay pipeline. Lessee destroyed pipeline laid down by licensee even though the pipeline did not interfere with lessee's operation. Lessee defended by asserting an exclusive right to lay pipeline pursuant to its lease.

The Supreme Court considered the language of the lease as a whole and found that although owner granted lessee the right, inter alia, to "lay and operate pipe-lines," that right was "limited to the use of the land for the purpose of producing the minerals. Any use by the owner, or others operating under him, *which does not affect the search for and production of the minerals,* is lawful, and the defendants have no right to interfere with such use, except when in the actual exercise of the lessees' rights under the lease . . . ." (*Brookshire Oil Co.* v. *Casmalia Etc. Co., supra,* 156 Cal. at p. 217, italics added.)

The Supreme Court found that the rights granted by the lease were "for special purposes only, and so far as may be necessary and convenient for such purposes and no further." (*Brookshire Oil Co.* v. *Casmalia Etc. Co., supra,* 156 Cal. at p. 215.)

The Supreme Court found that lessor retained the right of possession and dominion over the rest of the land and "*may use it for any purpose not*

*inconsistent with the rights granted by the agreement.*" (*Brookshire Oil Co.* v. *Casmalia Etc. Co., supra,* 156 Cal. at p. 217, italics added.) Accordingly, the Supreme Court found that owner's licensee had the right to lay and maintain the pipeline, "*so long as it does not interfere with the actual operations of the defendant under the lease.*" (*Id.,* at p. 218, italics added.) ▇ Thus, the surface owner retains all rights to use the surface *which do not interfere with the operation of the mineral estate.*

"Reasonableness in the exercise of rights is a fundamental tenet of the law, whether in the field of real property or in the countless other areas . . . ." (*Wall* v. *Shell Oil Co.* (1962) 209 Cal.App.2d 504, 516 [25 Cal.Rptr. 908].) Even under traditional rules, *ante,* the right of the surface owner is subordinate to an oil and gas lessee, and he may not affect the mineral estate owner's rights so as to prevent his enjoyment thereof or unreasonably interfere therewith. (*Id.,* at pp. 516-517; *Tidewater Oil Company* v. *Jackson, supra,* 320 F.2d at p. 163.)

In *Don* v. *Trojan Construction Co.* (1960) 178 Cal.App.2d 135 [2 Cal Rptr. 626], defendant dumped dirt on plaintiff's property without permission. The appellate court stated that " '[o]ne who intentionally enters land in the possession of another without a privilege to do so is liable . . . although he acts under a mistaken belief of law or fact, however reasonable, not induced by the conduct of the possessor, that he . . . (b) has the consent of the possessor or of a third person who has the power to give consent on the possessor's behalf. . . .' [Citation.]" (*Id.,* at p. 138.)

▇ The "authorization" given by the Righetti successors does not justify Union's interference and degradation of Escolle's rights in its mineral estate. (*Smith* v. *Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 778 [184 Cal.Rptr. 308].) ▇ Where one has permission to use land for a particular purpose and proceeds to abuse the privilege, or commits any act hostile to the interests of the lessor, he becomes a trespasser. (*Rogers* v. *Duhart* (1893) 97 Cal. 500, 506-507 [32 P. 570].)

"A good faith belief that entry has been authorized or permitted provides no excuse for infringement of property rights if consent was not in fact given by the property owner whose rights are at issue. [Citations.] ▇ Accordingly, by showing they gave no authorization, [Escolle] established the lack of consent necessary to support their action for injury to their ownership interests. [Citations.]" (*Smith* v. *Cap Concrete, Inc., supra,* 133 Cal.App.3d at p. 778.)

Substantial evidence supports the finding of the trial court that Union's injection of wastewater interfered with and damaged wells in the mineral

estate which are subject to the lease. The Escolle lease experienced a sudden drop in oil production in A-16 and in its other wells after Union began to inject the wastewater into A-16. This activity resulted in a concomitant increase in the "water to oil ratio" (WOR) which directly corresponded with Union's use of A-16 to dispose of its offsite wastewater. After Union stopped injecting the wastewater into A-16, oil production increased and the WOR decreased in these wells and throughout the Escolle field.

Ordinarily, the production of oil wells predictably and steadily decreases over time, while the amount of water produced increases. As the trial court found, the evidence did not support a theory promulgated by one of Union's experts that an impenetrable shale layer separated the disposal area from the producing area of the Escolle lease. Even that expert admitted that the evidence substantiated the position that the wastewater "communicated" with and affected these oil wells and other oil and mineral producing areas of the Escolle lease.

Union's injection of offsite wastewater "to maintain production of oil on leases other than the Escolle Lease" exceeded the scope of consent under the lease. And even if Righetti could authorize injection of offsite water for purposes other than operating onsite mineral operations, a point we do not decide, he could not authorize degradation of the mineral estate. Union's injection activities caused injury to the rights Escolle reserved to itself in this mineral field and thereby it committed trespass thereto.

The instant case is analogous to *West Edmond Hunton Lime Unit* v. *Lillard* (Okla. 1954) 265 P.2d 730, 731-732. In that case, the appellate court upheld recovery of an assignee of an oil and gas lease for expenses incurred in attempting to shut off the flow of salt water injected by defendant and the resultant inability to recover casing from a formerly producing oil well.

The instant case is unlike *Sunray Oil Co.* v. *Cortez Oil Co.* (1941) 188 Okla. 690 [112 P.2d 792], in which the court found "there is no probability that any possible oil producing formation exists in the land in question which would be materially affected to plaintiff's detriment by the use of the well in question for the disposal of salt water by defendant." (At p. 795.) No oil or gas had been found at the well in question, nor had any been found in the 80-acre tract in question. (*Id.*, at pp. 793, 794.)

In *West Edmond Salt Water Disposal Ass'n* v. *Rosecrans* (1950) 204 Okla. 9 [226 P.2d 965], defendants' injection of salt water into land adjacent to the subject property caused no actual damage to the full and complete use, occupation and enjoyment of plaintiffs' property. (P. 969.) Even if the

injection of salt water could migrate and percolate under plaintiffs' land, that formation had already been "completely saturated with salt water, and . . . no oil or gas was being or could be produced therefrom." (*Id.*, at p. 968.)

The *Rosecrans* court explained that "if the formation into which such valueless substance [salt water] is injected is already filled with a similar or identical valueless substance, a portion of which is displaced by the water migrating from the lands of the defendants into and under the lands of the plaintiffs, we are unable to see where any injustice has been done to plaintiffs, or the value of their property or their rights in their property in any wise diminished." (*West Edmond Salt Water Disposal Ass'n* v. *Rosecrans, supra*, 226 P.2d at p. 970.) Not so here.

Unlike *Rosecrans* and *Sunray*, the Escolle TIC alleged and proved they were damaged by Union's injection of its offsite wastewater, even though Escolle could not quantify the extent of that damage. (Cf. *West Edmond Salt Water Disposal Ass'n* v. *Rosecrans, supra*, 226 P.2d at p. 972.)

In *Phillips Petroleum Co.* (Nov. 17, 1988, 87-97) 105 Interior Board of Land Appeals 345, the court rejected the contention of the Federal Bureau of Land Management that Phillips must obtain a permit to inject salt water into mineral space owned by the United States. In that case, however, the court relied upon the rule that "once the minerals have been removed from the soil, the space occupied by the minerals reverts to the surface owner by operation of law." (*Id.*, at p. 350.) The court explained that this general rule derived from the "general interpretation of a mineral grant as giving the grantee the right to explore for, produce, and reduce to possession if found, the minerals granted, but not the stratum of rock containing the minerals." (*Ibid.*)

In *Phillips*, apparently the subject well was devoid of minerals by the time of injection and "'. . . there should be no communication [between the injected water and other mineral zones]' . . . ." (*Phillips Petroleum Co., supra*, 105 Interior Board of Land Appeals at p. 350.) In dicta, the court stated, "[f]inally, we note that an operator would be liable to the United States for damages should its water injection activities adversely affect the United States owned mineral interest. [Citations.]" (*Id.*, at p. 352.)

Surface owners typically own nearly all rights in the land except for the exclusive right to drill for and produce oil, gas and other hydrocarbons. The owners of the mineral estate, and their lessees, typically hold only the very limited right, analogous to an easement, to drill and capture subsurface oil and gas, and the incidental rights necessary to accomplish this. Thus, under

a typical oil and gas lease, the lessee generally obtains only a nonpossessory interest in real property to capture such substances, which is in the nature of an easement.

Union opines that because the surface owner, Righetti, owns the "pore space" of A-16 under these rules, Union properly obtained permission to inject its wastewater into A-16 from Righetti and the state. But, even if Righetti did own the pore space and could authorize injection into A-16, Righetti could not authorize the injury Union caused to Escolle's mineral estate. Under the instant deed, Escolle owns the minerals, oil and gas throughout the field and the right to capture such substances. Union's activity damaged these interests held by Escolle.

Courts have adopted general rules regarding divided estates in land as a reasonable way to account for royalties to substances mined which by nature are vagrant and fugacious.

Union places great reliance upon the case of *Callahan* v. *Martin, supra,* 3 Cal.2d 110, and its progeny, which discuss these rules to substantiate its position. Such reliance is misplaced.

*Callahan* is a quiet title action concerning a traditional assignment of a 3 percent royalty fee to " '. . . all oil, gas and other hydro-carbon substances and/or minerals produced, extracted and saved' " on the subject property. (*Callahan* v. *Martin, supra,* 3 Cal.2d at pp. 112-113.) This assignment derived from a simple reservation of "a one-sixth landowner's royalty in the oil and other substances to be produced . . . ." (*Id.,* at p. 112.) The question presented in *Callahan* was whether an assignment of a percentage royalty interest in an oil and gas lease survived a transfer of the land by the owner in fee. The *Callahan* court discussed and determined the nature of the interests transferred by such typical oil and gas leases.

In recognition that oil, gas and other hydrocarbon substances are fugacious and vagrant in nature, the *Callahan* court adopted the general rules, *ante*: "that the owner of land does not have an absolute title to oil and gas in place as corporeal real property, but, rather, the exclusive right on his premises to drill for oil and gas, and to retain as his property all substances brought to the surface on his land." (*Callahan* v. *Martin, supra,* 3 Cal.2d at p. 117; see generally *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 877-880 [69 Cal.Rptr. 612, 442 P.2d 692], which summarizes *Callahan* and its progeny on these points.)

The *Callahan* court further explained that "[i]t was not contemplated that the rights assigned to the Martins should in any way infringe upon the rights

of the operating and producing lessee." (*Callahan* v. *Martin, supra,* 3 Cal.2d at p. 114.)

These rules are largely irrelevant here because of Union's permanent trespass in Escolle's estate. Regardless of who owns the pore space or injection rights, Union's injection activity caused the migration of its waste-water from A-16 which communicated with oil in wells and elsewhere on the lease thereby damaging Escolle's right to drill for oil and gas and to extract other minerals on the lease. These are rights reserved solely to Escolle under the terms of the deed.

Union argues it should not be held liable because Escolle did not establish the extent of damage. ■ "One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness." (*Zinn* v. *Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, 297-298 [149 P.2d 177]; *Bertero* v. *National General Corp.* (1967) 254 Cal.App.2d 126, 151 [62 Cal.Rptr. 714].) ■ Because Union damaged Escolle's mineral estate without its consent, it is liable to Escolle in damages.

### Damages

Generally, "[t]he measure of damages suffered by reason of a tortious act is the amount which will compensate for all the detriment proximately caused thereby whether it could have been anticipated or not. (Civ. Code, § 3333.) ■ For such wrongs damages will be awarded to the extent that the injured party will be restored to the position he would have occupied had the trespass not occurred. [Citations.]" (*Alphonzo E. Bell Corp.* v. *Listle* (1946) 74 Cal.App.2d 638, 650 [169 P.2d 462].)

Civil Code section 3334 states, in pertinent part, that "[t]he detriment caused by the wrongful occupation of real property . . . is deemed to include the value of the use of the property for the time of that wrongful occupation . . . and the costs, if any, of recovering the possession." ■ Accordingly, one measure of damage for trespass is the reasonable rental value of the property during the wrongful occupation. (See generally *Lindberg* v. *Linder, supra,* 133 Cal.App. at pp. 218-219; *Murphy* v. *Nielsen, supra,* 132 Cal.App.2d at p. 399; *Don* v. *Trojan Construction Co., supra,* 178 Cal.App.2d at pp. 138-139.)

There are many ways, however, to determine the proper measure of damages for wrongful occupation of property, and courts are very flexible in choosing a measure of recovery which is most appropriate to the particular

facts of the case. (See *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 606 [271 P.2d 122], citing cases.) "There is no fixed rule with respect to the measure of damages for the wrongful injury or destruction of property. Each case must be determined on its particular facts." (*Givens* v. *Markall* (1942) 51 Cal.App.2d 374, 379, 381 [124 P.2d 839]— cost to replace fixtures in same condition as those removed held to be proper measure.) " '. . . [W]hatever rule is best suited to determine the amount of the loss in the particular case should be adopted. . . .' " (*Id.*, at pp. 379-380.)

In 15 American Jurisprudence at page 514, section 106 states, in pertinent part: " '. . . The amount to be awarded depends upon the character of the property and the nature and extent of the injury, and the mode and amount of proof must be adapted to the facts of each case. . . .' " (*Givens* v. *Markall, supra*, 51 Cal.App.2d at p. 379.)

In *Lineberger* v. *Delaney Petroleum Corp.* (1935) 8 Cal.App.2d 153 [47 P.2d 326], for example, lessor sued oil and gas lessee for wrongful use and occupation of land which was not covered under the lease. Lessee asserted that its entire use and occupancy was under authority of the lease, although evidence showed lessee used the leased land for both lease and nonlease purposes and erected buildings on part of the property in derogation of express provisions of the lease.

Lessee argued that such unauthorized use is compensated by rental or royalty under the lease or that the applicable measure of damages is the damages resulting from the unauthorized use of leased property under Civil Code section 1930 (providing for recovery of all damages resulting from nonlease uses of "things" let).

Lessor in *Lineberger* did not sue under the lease, but sued for wrongful use and occupation of its land not under the lease. The *Lineberger* court found that the proper measure of damages was the reasonable value for trespassory use and occupation under Civil Code section 3334. (*Lineberger* v. *Delaney Petroleum Corp., supra*, 8 Cal.App.2d at pp. 155, 157.)

In *Dandoy* v. *Oswald Bros. Paving Co.* (1931) 113 Cal.App. 570, 572-573 [298 P. 1030], the appellate court stated that the remedy for wrongful dumping of rock, even where the value of the land is not affected, is the reasonable cost of restoration (removal of material dumped). ■ Deterioration in market value of property is the proper measure for continuing nuisance which cannot be abated. Such measures of damages are proper even if the actual injury to the property is nominal. (*Don* v. *Trojan Construction Co., supra*, 178 Cal.App.2d at pp. 137-138.)

In *Inyo Chemical Co. v. City of Los Angeles* (1936) 5 Cal.2d 525, 540-543 [55 P.2d 850], the appellate court approved a measure of damages for negligent flooding of a field covered with the mineral trona as the value of the mineral destroyed, less the cost of producing and marketing it, reduced to present value and the costs of various related infrastructure repairs.

The *Listle* court states that "[w]hile the general rule for ascertaining damages to real property injured or destroyed by a trespass is to prove its diminution in value resulting from the wrongful act [citations], yet there is no universal test for determining such sum. [Citation.] One method is by estimating the cost of replacement of improvements. [Citations.] But in view of the doubt as to the correct measure where the injuries affect the entire freehold as well as the value of separate structures thereon, care must be exercised in selecting the rule as to the measure of damages applicable in any given case. [Citation.]" (*Alphonzo E. Bell Corp. v. Listle, supra,* 74 Cal.App.2d at p. 650.)

Indeed, courts need not "rely upon the familiar principles declared by the foregoing authorities." (See *Alphonzo E. Bell Corp. v. Listle, supra,* 74 Cal.App.2d at pp. 650-651, citing a case from a sister state for the proposition that even though the value of a destroyed prospect hole in a producing oil field cannot be established, a remedy for damage thereto is the amount of money necessary to redrill the well to the horizon at which the destruction occurred and not for prospective profits or the value of an oil well; also see *Pacific Gas & Elec. Co. v. County of San Mateo* (1965) 233 Cal.App.2d 268, 273-275 [43 Cal.Rptr. 450], which discusses the myriad means courts use to measure damages for injury to real property.)

 " 'California recognizes that: "Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention." [Citation.] In the same spirit it is said . . . "Living as we do in a world of change, equitable remedies have necessarily and steadily been expanded to meet increasing complexities of such changing times, and no inflexible rule has been permitted to circumscribe the power of equity to do justice. As has been well said, equity has contrived its remedies 'so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated,' and 'has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirement of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrong are constantly committed.' [Citation.]" . . .' " (*Bertero v. National General Corp.,*

*supra*, 254 Cal.App.2d at pp. 145-146.) "A court of equity is empowered, under appropriate conditions, to award damages along with declaratory relief." (*Id.*, at p. 147.)

Awarding the amount of money necessary to redrill a well "was the most equitable means of compensating the owner, since there was no way of knowing whether the hole would ever be a producer and, if so, what profits would be made." (Dicta in *Basin Oil Co.* v. *Baash-Ross Tool Co., supra*, 125 Cal.App.2d at p. 609, commenting on *Alphonzo E. Bell Corp.* v. *Listle, supra*, 74 Cal.App.2d 638.)

Here, however, Union did not simply destroy a particular oil well. Its lengthy injection of wastewater resulted in widespread damage throughout a large oil, gas and mineral field. As the appellate court stated in *Samuels* v. *Singer* (1934) 1 Cal.App.2d 545, 548-549 [36 P.2d 1098], "the [trial] court has jurisdiction to grant 'any relief consistent with the case made by the complaint and embraced within the issue'. [Citations.]"

In most respects, the *Samuels* case is a routine action for wrongful occupation of rental property for which the appropriate measure of damages is the reasonable rental value of the premises. The facts contain one significant twist, however. A subtenant involved in the ejectment proceeding was not in privity of contract with the lessor.

After reviewing case law, the appellate court in *Samuels* "deduce[d] the proposition that one wrongfully occupying the real property of another is liable to the owner for damages in tort; that the owner may waive the tort and sue on the contract implied in law as resulting from such tort, and that such contract, thus implied in law, obligates the wrongful occupant of real property to pay to the owner thereof the reasonable value of the use thereof during the period of such occupancy." (*Samuels* v. *Singer, supra*, 1 Cal.App.2d at p. 554; see also *Herond* v. *Bonsall* (1943) 60 Cal.App.2d 152, 155-156 [140 P.2d 121]—quasi-contract is proper measure of damages for benefit of storage in continuing trespass where cross-defendant refused to remove trade fixtures upon termination of lease. Tort may be waived and action is in implied assumpsit to recover value of use taken—benefit to trespasser for use.)

 In the instant case, the trial court arrived at a measure of damages reflecting such quasi-contract principles, even though it purported to do so under Civil Code section 3334. Such a measure is apropos.

The circumstances here are unique. Substantial evidence established that Union's injection activities damaged A-16, other wells in the leased field

and the mineral estate generally. Because Union's activities render it difficult, if not impossible, to trace completely the injuries it caused, resort to more traditional measures of damages such as cost of replacement, cost of restoration, diminution in value or fair rental value cannot be readily used. But the difficulty in determining damages does not bar recovery. (See *Zinn v. Ex-Cell-O Corp.*, *supra*, 24 Cal.2d at pp. 297-298.)

Under theories and damages propounded and prayed for in the complaint, in Escolle's trial brief and through evidence presented during the damages phase of trial, the trial court arrived at a reasonable quasi-contractual measure of damages—the fair market cost to dispose of the injected wastewater at available sites in the area during the pertinent period. This is the amount of money Union would have had to pay to others to dispose of the excess water, and therefore the amount of Union's unjust enrichment.

The trial court found that operators in the area charged $1.75 per barrel delivered to disposal sites. For its own benefit, Union injected 2,067,343 barrels of wastewater into A-16 to preserve disposal capacity in its own field and to boost production of oil and gas on that field. The trial court found that Union should disgorge the benefit, implied in law, that it derived by the trespass and accordingly awarded the Escolle TIC judgment in the principal sum of $3,617,843. The trial court did not include the additional fair market sum of 68 cents per barrel then charged to move the water to the disposal site.

Substantial evidence supports the judgment as prayed for in the complaint. At all pertinent times there was an extreme shortage of wastewater disposal sites in the area. The only two available sites in the region both charged $1.75 per barrel. Conoco, an oil company operating as a farmee of Union, used one of these two sites and paid $1.75 and transportation costs to dispose of its wastewater. Union knew of the monthly amount of wastewater it injected into A-16, as shown in the statement of decision.

Evidence proffered by Union for measure of damages did not present parties similarly situated to the instant ones. In each transaction presented by Union, the landowner offering the right to dispose of wastewater had a preexisting relationship with Union and Union stood to benefit in collateral ways from these arrangements. Thus, these business relationships presented by Union were not at arms length. They do not represent an accurate fair market valuation.

Also, almost all of the agreements proffered by Union fell outside the relevant time period which was marked by a critical shortage of disposal

capacity and sites. Furthermore, the Escolle TIC had no comparable protections for risk and indemnity against such damage as occurred here.

Union failed to properly substantiate any fair market value other than that presented by Escolle. The conduct of Conoco and Union at the time of paying the cost utilized by the trial court for disposing of other wastewater particularly supports the judgment. We agree with the trial court that the analysis of the available market for such injection proffered by Escolle provides the best basis shown for evaluating the value of damages in this unique situation.

### Prejudgment Interest

Civil Code section 3287, subdivision (a) states, in pertinent part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, . . . is entitled also to recover interest thereon . . . ." The test for recovery of prejudgment interest under section 3287, subdivision (a) is whether "*defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount." (*Chesapeake Industries, Inc.* v. *Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907, 911 [197 Cal.Rptr. 348].)

Ordinarily, where, as here, defendant "could keep complete records of the transaction [the monthly amounts of wastewater disposed of] from which it could calculate its indebtedness," prejudgment interest may be awarded from the inception of the occurrence. (*Chesapeake Industries, Inc.* v. *Togova Enterprises, Inc., supra,* 149 Cal.App.3d at p. 911.) "It is the rule that if damages may be determined by reference to reasonably ascertainable market values, they are 'capable of being made certain by calculation' within the meaning of section 3287 *supra*." (*Howe* v. *City Title Ins. Co., supra,* 255 Cal.App.2d at p. 88.)

"The mere fact that proof is required to determine *the market value* of property on a designated date, will not prevent the allowance of interest under section 3287 . . . ." (*Bare* v. *Richman & Samuels, Inc., supra,* 60 Cal.App.2d at p. 419—concerning market value of grapes which could be ascertained.)

In actions in quantum meruit, however, the exact amount to which the plaintiff is entitled is usually considered uncertain until it has been determined by the court upon presentation of evidence. Typically, plaintiff's claim is in the nature of an unliquidated and uncertain demand and therefore prejudgment interest is disallowed. (See *Samuels* v. *Singer, supra,* 1 Cal.App.2d at pp. 555-556.)

Although Union disagrees with the *standard* to be applied to damages here, it had available to it the values by which to calculate damages. It actually knew that the fair market value of disposal of offsite wastewater at the time was $1.75 per barrel because it entered into a disposal agreement, along with Conoco, during the relevant time period. Union also knew the amount of water it disposed of into A-16 at the time of injection.

Escolle stated the approximate number of barrels of water injected and the reasonable disposal rate in its complaint. Because Escolle placed Union on actual notice of demand, and the means of calculating damages, as of the filing of its complaint, prejudgment interest dating from the filing of the complaint is hereby allowed.

Moreover, the trial court also found that Civil Code section 3288 supports the award of prejudgment interest. We agree. Section 3288 states, in pertinent part: "In an action for the breach of an obligation not arising from contract, . . . interest may be given, in the discretion of the jury." Our Supreme Court has interpreted this statute to accord the same discretion to a trial judge acting as the trier of fact. (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814, fn. 16 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].)

██ The policy underlying authorization of an award of prejudgment interest is to compensate the injured party—to make that party whole for the accrual of wealth which could have been produced during the period of loss. (See *In re Pago Pago Aircrash of January 30, 1974, supra,* 525 F.Supp. at pp. 1013-1015; *Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra,* 26 Cal.3d at pp. 102-103.) ██ We hold that the trial court did not abuse its discretion in awarding prejudgment interest to Escolle; however we direct the trial court to modify the amount of such interest by calculating it as of the date of the filing of the complaint, July 1, 1985.

The trial court is directed to compute the amount of prejudgment interest in accordance with this opinion. In all other respects, the judgment is affirmed. Costs to the Escolle TIC.

Gilbert, J., and Yegan, J., concurred.

A petition for a rehearing was denied May 14, 1993, and appellants' petition for review by the Supreme Court was denied July 15, 1993.